# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

## APPEAL NO. 19-2253 & 19-2262 & 20-1274

### UNITED STATES
Appellee,

**v.**

### JOSE R. ANDINO-MORALES, a/k/a Gladiola;
### JOSE J. FOLCH-COLON, a/k/a Folch, a/k/a Gordo Folch;
### ANIBAL MIRANDA-MONTANEZ, a/k/a Jowi
Defendants—Appellants

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

---

## BRIEF FOR APPELLEE

---

W. Stephen Muldrow
United States Attorney

Mariana E. Bauzá-Almonte
Assistant United States Attorney
Chief, Appellate Division

Francisco A. Besosa-Martínez
Assistant United States Attorney
U.S. Attorney's Office
Torre Chardón, Room 1201
350 Carlos Chardón Street
San Juan, Puerto Rico 00918
Tel. (787) 766-5656
Fax (787) 771-4050

# TABLE OF CONTENTS

Table of Authorities ............................................................... iv

Jurisdictional Statement .......................................................1

Statement of the Issues on Appeal .....................................2

Statement of the Case ...........................................................3

Summary of the Argument...................................................39

Argument ................................................................................43

**I. The district court properly denied defendants-appellants' Rule 29 motion for a judgment of acquittal because the government presented sufficient evidence.**

Issue..................................................................................43

Standard of Review ........................................................43

Discussion ........................................................................43

**II. The government's rebuttal argument that the jury need not find that Folch was a chapter leader in order to convict was neither legally incorrect nor prejudicial, much less unfairly so.**

Issue..................................................................................69

Standard of Review ........................................................69

Discussion ........................................................................71

**III. The district court did not err in instructing the jury.**

Issue ................................................................................................... 76

Standard of Review ....................................................................... 76

Discussion ....................................................................................... 76

**IV. The district court did not procedurally or substantively err in imposing Andino's sentences.**

Issue ................................................................................................... 82

Standard of Review ....................................................................... 82

Discussion ....................................................................................... 83

Conclusion ............................................................................................... 93

Certificate of Compliance ................................................................... 94

Certificate of Service ........................................................................... 95

## TABLE OF AUTHORITIES

### FEDERAL CASES

Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546 (1st Cir.1994)............47

Boyle v. United States, 556 U.S. 938 (2009)..................................... 44-45, 50, 73

Brouwer v. Raffensperger, Hughes & Co., 199 F.3d 961 (7th Cir. 2000).......61

Buford v. United States, 532 U.S. 59 (2001) ......................................86

Dawson v. Delaware, 503 U.S. 159 (1992)........................................85

Ex Parte Bain, 121 U.S. 1 (1887) .......................................................71

Gall v. United States, 552 U.S. 38 (2007) ..........................................85

Salinas v. United States, 522 U.S. 52 (1997) ................................. 47, 62

Stirone v. United States, 361 U.S. 212 (1960) ...................................71

Taylor v. United States, ––– U.S. –––, 136 S. Ct. 2074 (2016)..........................54

United States v. Alicea–Cardoza, 132 F.3d 1 (1st Cir. 1997) ..........................74

United States v. Andujar, 49 F.3d 16 (1st Cir. 1995)........................................87

United States v. Angiulo, 847 F.2d 956 (1st Cir. 1988) ....................................45

United States v. Anonymous Defendant, 629 F.3d 68 (1st Cir. 2010)...... 84-85

United States v. Belanger, 890 F.3d 13 (1st Cir. 2018) ....................................76

United States v. Bobadilla-Pagán, 747 F.3d 26 (1st Cir. 2014) ........................44

iv

United States v. Boylan, 898 F.2d 230 (1st Cir. 1990) ......................................47

United States v. Brandao, 539 F.3d 44 (1st Cir. 2008)......................................66

United States v. Carpenter, 736 F.3d 619 (1st Cir. 2013)................................70

United States v. Cianci, 378 F.3d 71 (1st Cir. 2004) ..........................................47

United States v. Clogston, 662 F.3d 588 (1st Cir. 2011)...................................88

United States v. Connolly, 341 F.3d 16 (1st Cir. 2003) .....................................46

United States v. Cortés-Cabán, 691 F.3d 1 (1st Cir. 2012) ..............................55

United States v. Cortés-Medina, 819 F.3d 566 (1st Cir. 2016) ........................91

United States v. Daoust, 888 F.3d 571 (1st Cir. 2018).....................................88

United States v. Dixon, 449 F.3d 194 (1st Cir. 2006).......................................88

United States v. Duarte, 246 F.3d 56 (1st Cir. 2001) ........................................83

United States v. Elliott, 571 F.2d 880 (5th Cir. 1978) .......................................58

United States v. Ferguson, 246 F.3d 129 (2d Cir. 2001)...................................80

United States v. Fermin, 771 F.3d 71 (1st Cir. 2014)........................................85

United States v. Fisher, 3 F.3d 456 (1st Cir. 1993).............................................72

United States v. Fornia-Castillo, 408 F.3d 52 (1st Cir. 2005) ..........................72

United States v. Freitas, 904 F.3d 11 (1st Cir. 2018).........................................69

United States v. Garcia, 785 F.2d 214 (8th Cir. 1986) ......................................61

United States v. García-Pastrana, 584 F.3d 351 (1st Cir. 2009) ......................44

United States v. González-Pérez, 778 F.3d 3 (1st Cir. 2015)..................... 70, 77

United States v. González–Soberal, 109 F.3d 64 (1st Cir. 1997).....................77

United States v. Guerrier, 669 F.3d 1 (1st Cir. 2011) ................................ 46, 54

United States v. Gómez, 255 F.3d 31 (1st Cir. 2001).........................................63

United States v. Henry, 848 F.3d 1 (1st Cir. 2017) ................................ 2, 63, 82

United States v. Hernández, 218 F.3d 58 (1st Cir. 2000)........................... 43-44

United States v. Jiménez-Beltré, 440 F.3d 514 (1st Cir. 2006)................... 88-89

United States v. Jones, 455 F.3d 134 (2nd Cir. 2006) ......................................59

United States v. Jones, 566 F.3d 353 (3d Cir. 2009)..........................................65

United States v. Llanos-Falero, 847 F.3d 29 (1st Cir. 2017) ............................91

United States v. Lombard, 102 F.3d 1 (1st Cir. 1996) ......................................84

United States v. Madera-Ortiz, 637 F.3d 26 (1st Cir. 2011) ............................84

United States v. Marino, 277 F.3d 11 (1st Cir. 2002)........................................47

United States v. Marino, 833 F.3d 1 (1st Cir. 2016)..................................... 86-87

United States v. Marsh, 561 F.3d 81 (1st Cir. 2009) .........................................84

United States v. Millán-Machuca, 991 F.3d 7 (1st Cir. 2021) ................. passim

United States v. Nascimento, 491 F.3d 25 (1st Cir. 2007) ................... 46, 48, 53

vi

United States v. Olano, 507 U.S. 725 (1993) .......................................................70

United States v. Ortiz-Mercado, 919 F.3d 686 (1st Cir. 2019) ........................91

United States v. Politano, 522 F.3d 69 (1st Cir. 2008)................................. 83-84

United States v. Ramírez-Rivera, 800 F.3d 1 (1st Cir. 2015).............................2

United States v. Rivera-Berrios, 968 F.3d 130 (1st Cir. 2020) .........................82

United States v. Rodríguez, 525 F.3d 85 (1st Cir. 2008) ...................................73

United States v. Rodríguez, 675 F.3d 48 (1st Cir. 2012) ............................. 69-70

United States v. Rodríguez-Cardona, 924 F.2d 1148 (1st Cir. 1991) ..............85

United States v. Rodríguez-Torres, 939 F.3d 16   (1st Cir. 2019)....................54

United States v. Romero, 896 F.3d 90 (1st Cir. 2018) .......................................83

United States v. Rosario-Pérez, 957 F.3d 277 (1st Cir. 2020).........................64

United States v. Ruiz-Huertas, 792 F.3d 223 (1st Cir. 2015)...........................91

United States v. Ruperto-Rivera, 16 F.4th 1 (1st Cir. 2021) ....................... 90-91

United States v. Sepúlveda, 15 F.3d 1161 (1st Cir. 1993).......................... 63, 86

United States v. Sepúlveda-Hernández, 817 F.3d 30 (1st Cir. 2016)..............88

United States v. Shifman, 124 F.3d 31 (1st Cir. 1997)......................................47

United States v. Tormos-Vega, 959 F.2d 1103 (1st Cir.1992) ................... 73-74

United States v. Tse, 135 F.3d 200 (1st Cir. 1998)...............................................67

vii

United States v. Tucker, 404 U.S. 443 (1972) ........................................................85

United States v. Turkette, 452 U.S. 576 (1981)....................................................52

United States v. Twitty, 72 F.3d 228 (1st Cir. 1995)..........................................72

United States v. Valenzuela, 849 F.3d 477 (1st Cir. 2017)................................43

United States v. Vega-Figueroa, 234 F.3d 744 (1st Cir. 2000) ........................64

United States v. Vegas-Salgado, 769 F.3d 100 (1st Cir. 2014) ........................90

United States v. Watts, 519 U.S. 148 (1997) ......................................................85

United States v. Wihbey, 75 F.3d 761 (1st Cir. 1996)..................................69-70

United States v. Zannino, 895 F.2d 1 (1st Cir. 1990)........................... 76, 82, 88

## <u>FEDERAL STATUTES</u>

18 U.S.C. § 2.......................................................................................................16

18 U.S.C. § 1959(a)............................................................................................65

18 U.S.C. § 1959(a)(1) ......................................................................................16

18 U.S.C. § 1961(4)............................................................................................45

18 U.S.C. § 1962(c) ......................................................................................44-45

18 U.S.C. § 1962(d) ..................................................................................... 15, 45

18 U.S.C. § 3231...................................................................................................1

18 U.S.C. § 3553(a) ..................................................................................... 84, 91

18 U.S.C. § 3661.................................................................................85

18 U.S.C. § 3742(a) ..............................................................................1

18 U.S.C. § 3742(e) .............................................................................86

21 U.S.C. § 846...................................................................................16

28 U.S.C. § 1291..................................................................................1

## FEDERAL RULES

Fed. R. App. P. 4(b)(1) ..........................................................................1

Fed. R. App. P. 28(i) .............................................................................2

## FEDERAL SENTENCING GUIDELINES

U.S.S.G. § 1B1.4..................................................................................85

U.S.S.G. § 2E1.1.................................................................................36

## STATE STATUTES

P.R. Laws tit. 33, § 4651 .......................................................................78

P.R. Laws tit. 33, § 4651(c).....................................................................79

## JURISDICTIONAL STATEMENT[1]

This is a consolidated appeal from the final judgments of conviction and sentence imposed in Criminal Case No. 16-282 (ADC).[2] The district court had original jurisdiction under 18 U.S.C. § 3231. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

After the district court entered the final judgments (DE 3066, 3074, 3153), defendants-appellants timely filed their respective notices of appeal. (DE 3068, 3075, 3158). Fed. R. App. P. 4(b)(1).

---

1. References to the record will be as follows: Docket Entry or Entries (DE); MMB (Miranda-Montañez Brief); AMB (Andino-Morales Brief); FCB (Folch-Colón Brief); MMA (Miranda-Montañez Appendix); AMA (Andino-Morales Appendix); FCA (Folch-Colón Appendix). For purposes of simplicity, the government uses Miranda-Montañez's appendix for trial transcripts citations.

2. The trial was presided by Hon. Timothy S. Hillman, visiting U.S. District Court Judge from the U.S. District Court for the District of Massachusetts.

**STATEMENT OF THE ISSUES ON APPEAL**[3]

I.     **Did the government present sufficient evidence to support defendants-appellants' convictions?**

II.     **Was it legally incorrect or unfairly prejudicial for the government's to argue in rebuttal argument that the jury need not find that Folch was a chapter leader in order to convict him of the RICO conspiracy?**

III.     **Did the district court err in instructing the jury?**

IV.     **Did the district court sentence Andino to a procedurally and substantively reasonable imprisonment term?**

---

3.     In their opening briefs, defendants-appellants did not adopt each other's arguments on appeal. Fed. R. App. P. 28(i); *United States v. Ramírez-Rivera*, 800 F.3d 1, 12 (1st Cir. 2015). Because they do not attempt to adopt one another's arguments on appeal, they have waived the opportunity to so. *See United States v. Henry*, 848 F.3d 1, 7 (1st Cir. 2017) (arguments not raised in an opening brief are waived and cannot debut in a reply brief).

2

## STATEMENT OF THE CASE

### I.    *La Asociación ÑETA:* From Noble Beginnings to Criminal Enterprise

In the 1970's, Carlos Torres-Iriarte, a/k/a Carlos La Sombra, an inmate in the Puerto Rico prison system, founded an organization and association-in-fact known as *La Asociación Pro Derechos y Rehabilitación del Confinado* ("La Asociación ÑETA" or "the enterprise"). (MMA II at 98). Initially, La Asociación ÑETA seemed to have honorable intentions, with its members advocating for prisoner rights and striving for improved conditions for fellow inmates. (MMA II at 98-101; MMA III at 192; MMA IV at 144-45; MMA V at 200). In time, with changes in leadership, whatever noble beginnings La Asociación ÑETA may have started with had become a mere façade for its true nature as a criminal enterprise with thousands of members including prison inmates, corrupt correctional officers, and civilians that worked inside the prison system. (MMA II at 99-101; MMA III at 192; MMA IV at 144-45; MMA V at 200). To maintain control and broaden the enterprise's power and criminal operation, members of La Asociación ÑETA promoted a climate of fear through the use and threatened use of physical violence, including murder, against those who stood in their way.

3

As is relevant to this appeal, from on or about (but no later than) 2005 to 2016, La Asociación ÑETA's purpose was to make money for its members by introducing and distributing multi-kilogram quantities of controlled substances, *e.g.*, heroin, cocaine, and marihuana, into the Puerto Rico prison system. (MMA II at 101; MMA IV at 144-45). The enterprise also smuggled cellular phones into the Puerto Rico prisons. (MMA II at 100). La Asociación ÑETA used these cellular phones to conduct their drug trafficking scheme and charged inmates a fee, known as an "incentive" for their use. (MMA II at 100-101).

## II.     *La Asociación ÑETA*: Structural Organization

La Asociación ÑETA had an intricate structural organization consisting of various divisions and departments spread across the correctional institutions of the Puerto Rico prison system that contributed to the enterprise's overall mission and goals. (MMA II at 107-13; MMA IV at 147-48). At the very top of the organizational chart was the maximum leadership, composed of the highest-ranking members of the enterprise. (MMA II at 107-110; MMA IV at 147-148). La Asociación ÑETA's maximum leadership comprised of a maximum leader, a second maximum leader, a

4

secretary, and a person in charge of finances. (MMA II at 107-110; MMA IV at 147-48). The maximum leadership included two advisors (known as Advisor One and Advisor Two), a coordinator, and four chapter supervisors. (MMA II at 107-10; MMA IV at 147-48). Within the maximum leadership, they had their own hierarchy, with the top three members, known as "the three heads," wielding more power and influence than the others, and in some cases being able to act and give orders without consulting with the rest of the maximum leadership. (MMA II at 107; MMA IV at 147-48). The three heads were the maximum leader, the second maximum leader, and Advisor One. (MMA II at 106-07).

The maximum leadership oversaw and supervised the enterprise's activities across the different correctional institutions in the Puerto Rico prison system. (MMA II at 112). Each correctional institution was known as a chapter. (MMA II at 112). And for each chapter, the maximum leadership appointed as chapter leader a member of La Asociación ÑETA housed at that correctional institution that enjoyed their trust. (MMA V at 207). Being a position of trust, changes in the composition of the maximum leadership could lead to changes in chapter leaders. (MMA V at 207). Each chapter

leader served as the maximum leadership's eyes and ears, and supervised the drug and cellular phone trafficking that occurred at their prison facility and prepared detailed reports for the maximum leadership. (MMA II at 112, 114; MMA III at 206) Each chapter leader also established a chapter board resembling the composition of the maximum leadership, but which was limited to overseeing the ÑETA drug and cellular phone trafficking operation at their specific prison. (MMA II at 112).

The chapters were divided into two regions; those located in the San Juan metropolitan area and those situated south of the island. (MMA II at 204). Two of the maximum leadership's four chapter supervisors were assigned to supervise the metro area chapters, and the other two were responsible for supervising the southern chapters. (MMA II at 204). This entailed making sure everything was running smoothly at each chapter by keeping tabs of the drug quantities and cellular phones that went in and out of each prison, how much was being charged in incentives, and how the chapter leadership was conducting its business. (MMA II at 205; MMA III at 206; MMA IV at 158, 216)

Parallel to this structural organization, La Asociación ÑETA had non-

6

members within and outside the Puerto Rico prison system who helped them smuggle drugs and cellular phones into the correctional facilities throughout the island and stored the enterprise's earnings outside the prison walls. (MMA II at 82-83, 120). There were corrupt corrections officers and civilian employees in the Puerto Rico Department of Corrections and Rehabilitation. (MMA II at 120). The maximum leadership also had community liaisons, or spokespersons, in the free community with contacts at drug points who would supply the drugs and store the enterprise's earnings in bank accounts and would aid in conducting wire transfers via financial services companies like Western Union. (MMA II at 111, 127-28).

## III.    *La Asociación ÑETA*: The Drug Trafficking Business

With this set up, La Asociación ÑETA made approximately one million dollars' worth of monthly profits from their sales of controlled substances across the Puerto Rico prison system. (MMA II at 127; MMA IV at 153). Between all the chapters/prisons, La Asociación ÑETA had monthly drug sales of around 1.5 to 3 kilograms of heroin, 1.5 to 2 kilogram of cocaine, and 40-50 lbs. of marihuana. (MMA II at 126-27).

But not all the drugs and money were the same. On the one hand, there

was what was known as the general fund drugs, which were supplied by the maximum leadership to each chapter for distribution. (MMA II at 115-116). Proceeds from these drug sales would go to the maximum leadership. (MMA II at 115-17). This money was then reinvested in the purchase of more drugs. (MMA II at 115-17). It was also used for open houses, meaning yearly or bi-yearly activities in which prisoners spent time enjoying food, drinks, and live music with their families. (MMA III at 33-34, 197-199; MMA V at 203-04).

On the other hand, individual ÑETA members could possess personal drugs. (MMA II at 115-16). But to sell their own drug supply, these individuals had to pay La Asociación ÑETA a fee, known as an incentive. (MMA II at 114). They could also smuggle in their own cellular phones by paying a separate incentive for that purpose. (MMA III at 196, 206; MMA IV at 90). The money raised from these fees was given to the ÑETA member responsible for the finances of that chapter and were placed in an incentive pot, separate from the pot money that went to the maximum leadership. (MMA IV at 108). The chapter leader would then decide how to use the money from the incentive pot. (MMA IV at 108).

8

All these drug trafficking transactions, from the mobilization of drugs by the maximum leadership to the different chapters to the entry of personal drugs to the final sale of the drugs to the consumers, were handled via the cellular phones that were smuggled into the different chapter prisons. (MMA II at 204). The drugs and cellular phones would enter the different prisons using different methods including visitors, corrupt officers, and even "pitched in" by being thrown over prison fences from the outside and into the prison grounds. (MMA II at 82-83, 120, 244; MMA IV at 149).

## IV. *La Asociación ÑETA*: Membership and Defendants-Appellants' Roles in the Enterprise

As sophisticated as La Asociación ÑETA's drug operations were, so too was its process for accepting new members into the enterprise. Not just any inmate could become a ÑETA member. (MMA II at 102-05). Once admitted into the Puerto Rico prison system, inmates had to choose which prison gang or organization they wanted to belong. (MMA II at 102). Besides La Asociación ÑETA, other prison gangs included those known as the 27s, the 25s, and the 31s. (MMA II at 102). An inmate also had the option of remaining neutral by not associating with any group. (MMA II at 102).

9

Inmates that opted to apply to join La Asociación ÑETA had to submit to a screening (or monitoring) process. (MMA II at 104). The enterprise inquired about the inmate candidate's criminal record, to ensure he had no cases of domestic abuse, child abuse, lewd activities, or a history of cooperating with law enforcement. (MMA II at 104-105). Defendants-appellants were all ÑETA members. (MMA II at 223-27, 253; MMA III at 205; MMA IV at 155-56).

### A. José R. Andino-Morales, a/k/a Gladiola

Andino-Morales was a ÑETA member who paid the drug incentive to sell his personal supply of marijuana to the Chapter Leader at Bayamón 1072. (MMA III at 205, 213, 311). As for the cell phone incentive, he paid for this by selling drugs distributed by the maximum leadership for the enterprise. (MMA III at 311-12).

### B. José J. Folch-Colón, a/k/a Folch, a/k/a Gordo Folch

For his part, Folch was a ÑETA member who participated in the cocaine and heroin distribution business of the enterprise. (MMA II at 223-27; MMA IV at 155-56). For instance, he called José González-Gerena, a/k/a

10

Perpetua, ("Gerena"), a ÑETA member who worked as a missionary[4] and expressed interest in the quality of the heroin. (MMA IV at 136, 143, 221). Folch and Gerena made the contacts out in the street, and Gerena was able to get cocaine and heroin for Folch to sell. (MMA IV at 221). Folch would then engage in drug trafficking with other ÑETA members, going as far as sending heroin and cocaine to ÑETA members in other prisons. (MMA IV at 116, 221). And on the administrative side, Folch served as an advisor for the chapter leadership at the Green Monster, one of the prisons in the southern part of Puerto Rico. (MMA IV at 219-20).

But Folch's involvement with the ÑETA enterprise was not limited to its drug trafficking scheme. (MMA IV at 221-22). As a member, he also took advantage of its murder-for-hire business[5]  (MMA IV at 221-22). Specifically, Folch paid Gerena and Rolando Millán-Machuca, a/k/a Rolo (one of the advisors in the maximum leadership and one of the known "Three Heads"

---

4.     The term "missionary" here refers to the Spanish "misionario," which also refers to a person that is sent to deliver a message or expected follow marching orders. When the ÑETA missionaries were activated, "it means they're going on a mission to execute it." (MMA II at 117).

5.     More on this aspect of the enterprise later.

of the enterprise) to have Alexis Rodríguez-Rodríguez, a/k/a Alexis El Loco, killed. (MMA II at 230; MMA IV at 221-22).

### C. Anibal Miranda-Montañez, a/k/a Jowi, a/k/a Barba

Finally, Miranda was also a member of La Asociación ÑETA. (MMA II at 253; MMA IV at 155-56). In fact, Miranda served as chapter leader at the Ponce Main prison, sold drugs and cellular phones, and collected incentives. (MMA II at 191-92, 199, 203; MMA IV at 157).

As chapter leader, Miranda reported directly to the enterprise's maximum leadership. (MMA IV at 157). And as chapter leader, he was also responsible for collecting the incentives paid by ÑETA members at the Ponce Main prison. (MMA II at 199). Furthermore, Miranda seconded, or gave the final authorization, to carry out Rolo's order to kill Alexis El Loco, a murder paid for by Folch and carried out by Gerena. (MMA IV at 157).

### V. *La Asociación ÑETA*: Rules and Traditions

Once admitted into La Asociación ÑETA, members had to observe the enterprise's traditions and abide by its rules. (MMA II at 105-08). These were taught to them by the enterprise's "elders," *i.e.*, the older inmates who had been a part of the organization since its beginnings. (MMA II at 94). For

12

instance, ÑETA members could only incorporate a certain color scheme into their attire (they could only wear white and blue colors) and had a hand gesture where they placed their middle finger on top of their index finger, which stood for "the strong protects the weak." (MMA II at 108-09). Moreover, on the 30th of every month, ÑETA members would meet to commemorate the death of the enterprise's founder, Carlos Torres-Iriarte. (MMA II at 109). At this monthly gathering, they would raise their fists and yell, "ÑETA, ÑETA, ÑETA." (MMA II at 109).

As for the enterprise's rules, ÑETA members could not: cooperate with law enforcement; have cases of lewd activities or domestic abuse, nor abuse of minors or the elderly; nor abuse the weak or drug addicted inmates. (MMA II at 105-06). And at least on paper, they also could not commit contract killings. (MMA II at 105-06). If any inmate broke a rule, he would be disciplined or punished in a manner proportionate to the severity of the violation. (MMA II at 105-06). For example, cooperation with law enforcement would result in certain death. (MMA II at 106).

## VI.  *La Asociación ÑETA*: Some Rules were Made to be Broken

Not all rules, however, were strictly followed. (MMA II at 105).

Although expressly prohibited under the enterprise's rules, members of La Asociación ÑETA, including those within the maximum leadership, did commit contract killings for profit. (MMA II at 105). One of those murders took place in November 2014 at the Ponce Main Prison. (MMA III at 267-68).

Folch had a gripe against Alexis El Loco, an inmate at the Ponce Main prison, and paid for La Asociación ÑETA's kill services. (MMA II at 186-87; MMA III at 267-68; MMA IV at 222; MMA V at 135). Rolando Millán-Machuca, a/k/a Rolo, an advisor in the maximum leadership and one of the three heads of the enterprise, gave the order to kill. (MMA IV at 223, 227-28). Miranda, as the chapter leader at the Ponce Main prison, gave the go ahead to carry out Rolando's orders. (MMA II at 185, 191; MMA IV at 157). And so, ÑETA members that went by the nicknames of Perpetua (José González-Gerena), Kino, Bombi, and Batata murdered Alexis El Loco via a lethal injection of heroin. (MMA II at 185-86, 189-91; 223). Alexis El Loco put up a fight at first and, in order to subdue him, Gerena started to strangle him until finally being able to inject the heroin. (MMA II at 250-51). Miranda then took him to the prison's emergency room in an attempt to make it look like an accidental overdose. (MMA II at 250-251; MMA V at 208-209). After

committing the killing, Gerena spoke to Rolando's brother, who was the maximum leader, and confirmed the murder of Alexis El Loco had been a ÑETA-authorized killing. (MMA V at 35-136).

Another one of the contract killings linked to La Asociación ÑETA was that of Mario Montañez-Gómez, a/k/a Mario Emme, an inmate in the Bayamon 1072 facility. (MMA II at 206-07). After receiving payment, the maximum leadership ordered the killing of Mario Emme, which was seconded by Freddie Sánchez-Martínez, the Bayamón 1072 chapter leader. (MMA II at 207, 222; MMA III at 208, 254). All participants in the murder (Sánchez; Andino; Andy Caimito; Bengie Loíza; and Bebe Cupey) were ÑETA members. (MMA II at 213-14, 223; MMA III at 261).

## VII.  Indictment and Trial Evidence

As a result of a federal investigation into the illegal activities of La Asociación ÑETA, a grand jury returned a 4-count indictment against 50 ÑETA members. (MMA VI at 319-53). Defendants-appellants were charged with RICO conspiracy for conspiring to participate in the conduct of affairs of the ÑETA association through a pattern of racketeering, in violation of 18 U.S.C. § 1962(d) (Count One) and conspiracy to possess with intent to

distribute controlled substances, in violation of 21 U.S.C. § 846 (Count Two). (MMA VI at 320-41). Moreover, Miranda and Andino were charged, alongside other ÑETA members, under Count Three, for committing a violent crime in aid of racketeering, *i.e.*, the murder of Mario Montañez-Gómez, a/k/a Mario M., Emme, in violation of 18 U.S.C. §§ 1959(a)(1) and 2. (MMA VI at 342-47). Meanwhile, under Count Four, Miranda and Folch were charged with other ÑETA members for committing a violent crime in aid of racketeering, *i.e.*, the murder of Alexis Rodríguez-Rodríguez, a/k/a Alexis El Loco, in violation of 18 U.S.C. §§ 1959(a)(1) and 2. (MMA VI at 348). Defendants-appellants, along with another one of their co-defendants, Freddie Sánchez-Miranda, went to trial together.

During the 13-day trial, the government presented substantial evidence, including the testimony from three cooperating witnesses, each a former member of La Asociación ÑETA. Through their testimony, they established the existence of the enterprise, explained its structural organization, its purpose and business goals, as well as its rules and traditions. *See supra*, Statement of the Case, Parts I-VI. They also identified all defendants-appellants as members of La Asociación ÑETA and explained

16

the roles each defendant-appellant played as a member of the enterprise. *See supra*, Statement of the Case, Part IV.

The government's evidence also included testimony from the special agents who conducted the investigation into La Asociación ÑETA and its drug business. (MMA II at 50-55). The special agents explained they had wiretapped several of the cellular phones the enterprise used to conduct its business. (MMA II at 48-54). In those conversations, ÑETA members could be heard conferring amongst themselves and with their outside suppliers over everything from housekeeping matters, disciplinary sanctions for ÑETA members who did not follow the rules or did not pay incentives that were due, to the specifics of drug deals that were being negotiated or taking place. (MMA II at 48-54). Throughout these conversations, the participants used code words when referring to controlled substances and other illegal acts, the actual meaning of which were explained to the jury by the ÑETA members who testified as cooperating witnesses for the government. (MMA II at 92, 197-99).

The government further had corrections officers from the Puerto Rico Department of Corrections and Rehabilitation testify about what they saw

while working at the prisons where ÑETA members were housed. (MMA II at 109; MMA III at 194; MMA IV at 147; MMA V at 207). They explained how, once a month, ÑETA members would gather for an apparent ritual ceremony during which they could be heard screaming "ÑETA, ÑETA, ÑETA." (MMA II at 109; MMA III at 194; MMA IV at 147; MMA V at 207). As confirmed by the cooperating witnesses, these monthly meetings were in commemoration of the enterprise's founder. (MMA II at 109; MMA III at 194; MMA IV at 147; MMA V at 207).

The corrections officers also testified about the various ways in which drugs and cellular phones were smuggled into the prisons. (MMA IV at 284-88). One time, an officer went to survey an area located by the entrance to the prison ÑETA prisoners were scheduled to clean up that day. (MMA IV at 284-88). During that surveillance, the officer's K-9 police dog alerted to an area covered in vegetation. (MMA IV at 284-88). Under the shrubbery, the officer found wrapped packages containing controlled substances. (MMA IV at 284-88). On another occasion, officers were driving inside the prison grounds when they saw packages being flung over the fence from outside the facility and landing inside the prison. (MMA IV at 284-88). Like the other

packages, these also contained contraband. (MMA IV at 284-88).

The corrections officers further testified about the lengths ÑETA members took to conceal the contraband that had initially made it into the prison without detection. (MMA II at 232). For instance, when officers conducted a search of the Ponce prison the day after Mario Emme's murder and its prisoners looking for contraband, "the identification system of Bengie Loiza rang out." (MMA III at 232-33, 315-17). He was then placed in a separate holding cell and monitored. (MMA III at 232-33, 315-17). After being taken to another room, Bengie squatted down and expelled contraband from his anus, *i.e.*, drugs and a cellular phone. (MMA III at 232-33, 315-17). The cellular phone had belonged to Mario Emme. (MMA III at 232-33, 315-17).

On another occasion when officers were conducting a search in one of the Ponce prisons, they found papers belonging to Miranda in one of the cells. (MMA II at 69). One was the sheet for inmates to order items from the prison commissary, and included Miranda's name, photograph, and account number. (MMA II at 70). Another was a letter from La Asociación ÑETA relating to payments and incentives in that prison. (MMA II at 70-71). It

19

included "the new organizational chart of the acting leaders of this chapter which reads as follows, and for which we expect your unconditional support." (MMA II at 71). The letter identified Miranda as the chapter leader. (MMA II at 71).

### VIII. Defendants-Appellants' Rule 29 Motions at Trial

After the government rested, Folch moved for a judgment of acquittal under Rule 29, alleging the government violated his right to a fair trial by constructively amending the indictment "to include a predicate that was not presented to the grand jury that issued the Indictment." (MMA V at 287). He claimed that while the indictment included murder under the Puerto Rico Penal Code as one of the predicates for Count One, the evidence at trial was for murder-for-hire, which was not a crime under the Puerto Rico Penal Code. (MMA V at 287). Folch also contended there had been no evidence he had participated in a pattern of racketeering activity. (MMA V at 287).

As for Count Two, Folch averred the evidence was insufficient to prove he engaged in a drug trafficking conspiracy. (MMA V at 288). He claimed there was no evidence showing he was a supplier and "no evidence of whether that supply was for the enterprise, or for the drugs of the fund,

or for the personal drugs." (MMA V at 288-89). According to Folch, the fact the cooperators testified he supplied them with drugs "d[id] not mean that he provided them with drugs for the enterprise or for themselves." (MMA V at 289).

Turning to Count Four, Folch harkened back to his murder-for-hire argument regarding Count One "that the crime, to be chargeable under state law, it must at least exist under state law," in order to serve as a predicate for RICO purposes. (MMA V at 289). In that sense, Folch contended the VICAR offense under Count Four "ha[d] to serve the enterprise" and the government purportedly did not present any evidence Folch's act of paying for the murder of Alexis El Loco promoted or enhanced the enterprise or his position within it. (MMA V at 290). Finally, in relation to Count Four, Folch contended that like with Count One, he alleged a "constructive amendment argument" claiming "the government did not establish that the enterprise existed." (MMA V at 291).

Meanwhile, Miranda moved to join co-defendant Folch's Rule 29 motion for acquittal "regarding the fact that the government presented a crime that did not exist in the Puerto Rican Penal Code. So they did not

provide the Court the elements of that RICO enterprise." (MMA V at 291-92). As to Count Three, the VICAR murder charge relating to the death of Mario Emme, Miranda claimed the evidence only showed he knew about the order to kill Mario Emme, "[b]ut he did not promote, he did not enhance, he did not do anything to promote that fact." (MMA VI at 292).

For his part, Andino joined Folch's Rule 29 arguments, asserting there was "no credible evidence" to support his conviction under any of the charges filed against him. (MMA V at 293).

Folch and Andino renewed their Rule 29 motions after Miranda had presented his case.[6]  (MMA VI at 39). And so did Miranda, adding there was no evidence he "knew that he was conspiring in terms of the racketeering charge" and "no evidence as to the murder charge that he's been charged in Count IV." (MMA VI at 39).

## IX.    Closing Arguments and Folch's Motion for Mistrial

---

6.    Miranda called one witness, Officer Eric Rivera-Murillo, who was a corrections officer at the Ponce Main prison the day La Asociación ÑETA murdered Alexis El Loco. Officer Rivera testified how Miranda informed him that they were bringing an inmate over – Alexis El Loco – so that he could get a wheelchair. (MMA VI at 27-29). Folch and Andino did not present a defense.

During closing arguments, counsel for Folch argued the jury should acquit Folch because the government's evidence, at most, showed Folch was a member of La Asociación ÑETA and the Indictment charged him "with being a chapter leader, which the government did not prove." (MMA VI at 65). In response, during its rebuttal the government pointed out to the jury that "the Indictment is not evidence" and that, in any case, Folch "was an advisor for the chapter leader[, which] [w]as part of the chapter leadership." (MMA VI at 133). All it had to show, the government argued, was that Folch and his co-defendants "were members of the Ñetas and that they agreed either they or someone else in the organization was going to engage in drug trafficking or murder." (MMA VI at 133). Folch did not raise a contemporaneous objection to his line of argument.

After closing arguments, the district court gave the final jury instructions. Regarding the first element of the RICO conspiracy count, the district court explained that if the jury

> f[ound] beyond a reasonable doubt that a conspiracy of some kind existed between the Defendant and some other person, that by itself is not sufficient to find the Defendant guilty. Again, the Government is required to prove, beyond a reasonable doubt, the existence of the conspiracy specified in the Indictment.

23

(MMA VI at 161). The district court noted the Indictment alleged Folch was a chapter leader. (MMA VI at 161). Furthermore, regarding the VICAR counts, the district court instructed the jury on first degree murder under the Puerto Rico Penal Code. (MMA VI 169-76).[7]

After the district court read the jury instructions to the jury, Folch moved for mistrial, asserting the government in its rebuttal had "advised the jury that they did not have to find that Mr. Folch Colon was a chapter leader" while at the same time not objecting to the fact that the district court's jury instructions "included that first element agreement charged in the indictment instruction which says that Mr. Folch was a chapter leader." (MMA VI at 198-99). Folch contended this failure to object by the government allowed his counsel, in the closing arguments, to assert that the jury had to find he was a chapter leader in order to convict. (MMA VI at 199).

The government countered it was "legally incorrect to require the jury to find him as a chapter leader as mentioned in the Indictment." (MMA VI

---

7.    The brief will delve more into detail as to these instructions in the substantive argument portion of the brief.

at 201-02). "[W]hat is the agreement and the enterprise is defined more broadly in the Indictment and does not include excess facts, such as that [Folch] was a chapter leader. Those are not necessarily going to what is the enterprise or the agreement." (MMA VI at 202). The district court responded to the government's argument affirmingly, "Okay, great." (MMA VI at 202).

## X.     Verdicts and Post-Verdict Rule 29 and Rule 33 Motions

Ultimately, the jury found Miranda and Folch guilty on Counts One (RICO conspiracy), Two (drug conspiracy) and Four (VICAR murder of Alexis El Loco). (MMA VI at 286-90). The jury also made special findings, determining that Miranda and Folch were each responsible for one kilogram or more of heroin, less than five kilograms of cocaine, and less than 50 kilograms of marihuana. (MMA VI at 287, 290).

Meanwhile, the jury found Andino guilty as to Count One (RICO conspiracy), but not guilty as to Counts Two (drug conspiracy) and Three (VICAR murder of Mario Emme). (MMA VI at 291-92). As to special findings, the jury did not hold Andino responsible for any amount of drugs. (MMA VI at 291-92).

After the jury returned its verdicts, each of the defendants-appellants

filed motions for judgment of acquittal under Rule 29. In his Rule 29 motion, Folch claimed the government failed to prove the existence of an enterprise, that Folch participated in the affairs of said enterprise, and the existence of a pattern of racketeering activity. (FCA 440-48). Furthermore, regarding the evidence presented as to the murder predicates, Folch maintained that "[m]urder for hire was not an offense under [Puerto Rico] law" and "[f]or a crime to be chargeable under state law, it must at least exist under state law." (FCA 448). "If the racketeering act is not prohibited at all under state law," Folch argued, "it may not serve as a predicate act for RICO purposes." (FCA 449).

Regarding Count One, Folch also took aim at the government's evidence showing that the activities of the enterprise affected interstate and foreign commerce. (FCA 449). According to Folch, "[t]he government's evidence failed to prove the enterprise itself directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce." (FCA 451). Additionally, regarding the government's expert witness on the subject, Folch maintained this testimony had little weight because the expert did not personally examine the particular drugs seized in

26

this case. (FCA 451). Because the seized drugs "came from an unknown source," Folch argued there was no evidence "proving the enterprise acquired the drugs in interstate commerce nor evidence connecting the activities of the purported enterprise with interstate commerce." (FCA 453).

As for Count Two, Folch claimed the evidence "clearly delineated a separate conspiracy" and "the government made no efforts to insert Folch's drug trafficking activities with those of La Asociación Ñeta as charged in the indictment." (FCA 453-54).

Finally, Folch claimed his conviction under Count Four was also unsupported by the record because (1) the government failed to prove the interstate commerce element, and (2) the evidence did not support a finding that Folch paid for Alexis El Loco's murder in order to maintain or increase his position within the enterprise. (FCA 454-57).

Meanwhile, in his Rule 29 motion, Miranda claimed "the government did not meet its burden to prove each one of the elements of the crimes charged beyond reasonable doubt." (MMA VI at 303). Specifically, Miranda averred the testimony of the government's cooperating witnesses, Alex Miguel Cruz-Santos, Orlando Ruiz-Acevedo, José González-Gerena, and

Osvaldo Torres-Santiago was not credible. (MMA VI at 303-05).

First, Miranda asserted that Cruz-Santos's testimony was not to be believed because "he was not serving his sentence in the same institution as [him]." (MMA VI at 303). And Miranda attempted to minimize the impact of Ruiz-Acevedo's testimony by claiming that, despite being part of the same chapter leadership as him, Ruiz-Acevedo did not testify or provide any evidence connecting him to the murder of Alexis El Loco. (MMA VI at 304-05).

As for the testimonies of Cruz-Santos, González-Gerena, and Torres-Santiago about Miranda "second[ing]" the order to murder Alexis El Loco and "let[ting] it go through," Miranda argued such action was not as nefarious as the government suggested because the cooperating witnesses also said Miranda allegedly had no choice in the matter insofar as no one purportedly had the authority to stop an order once it was handed down by the maximum leadership. (MMA VI at 303-05). So, accordingly, Miranda claimed his knowledge about the order to kill Alexis El Loco was not incriminating because he ostensibly had no power to stop it. (MMA VI at 305-06).

Furthermore, Miranda maintained the government failed to establish he was "plainly integral" to the enterprise's activities. (MMA VI at 307-08). In support of this contention, Miranda pointed to the wiretapped telephone conversation in which other ÑETA leaders discussed removing Miranda as chapter leader at the Ponce Main prison. (MMA VI at 308). Additionally, Miranda alleged the murder of Alexis El Loco "did not serve to advance or maintain" his position within La Asociación ÑETA because such a contract killing "was in direct violation of the rules." (MMA VI at 309).

Miranda also claimed murder-for-hire was not a crime under the 2012 Puerto Rico Penal Code and, when instructing the jury on the elements of the Puerto Rico offense, the district court allegedly "interchanged the concepts of malice, willful and deliberate adding concepts that were not found in the definitions contained" in the Puerto Rico Penal Code. (MMA VI at 311).

Miranda further averred the government failed to establish the interstate commerce element of the RICO offense because the source of the drugs that were seized in this case was never established. (MMA VI at 309). According to Miranda, because the government's expert witness on the

29

matter never inspected the seized contraband, "his testimony was based in general concepts but can't be related to the controlled substances seized in this case." (MMA VI at 310).

Finally, in his Rule 29 motion, Andino argued the government failed to prove he (1) knowingly joined the conspiracy, (2) participated in the conduct of the affairs of the enterprise, and (3) did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses. (AMA 12-16). Because he was acquitted as to Counts Two and Three, Andino averred there was no other evidence to prove knowledge and participation. (AMA 13). He maintained that with these acquittals, he "cannot be held as having 'agreed to participate in the conduct of an enterprise with the knowledge that some members would engage in at least two acts of murder or at least two acts of drug trafficking, or both of them, or any combination of them.'" (AMA 15). Additionally, he asserted that "[b]eing a member of La Asociacion Ñeta in and of itself is insufficient to prove a RICO conspiracy." (AMA 16).

Meanwhile, in his Rule 33 motion, Folch again moved for mistrial based on the government's rebuttal argument that the jury did not have to

find Folch was a chapter leader in order to convict. (FCA 470). Folch argued that "[t]he government made a choice in the Indictment as to the element of participation attributable to Folch and the court instructed the jury accordingly," and that he had tailored his closing argument "in line with the government's failure to prove" the level of participation described in the indictment and jury instructions. (FCA 472). As such, Folch maintained that "[t]he government's rebuttal unfairly prejudiced [him] and deprived him of a fair trial." (FCA 472).

## XI.    Government's Response to the Rule 29 and Rule 33 Motions

The government opposed defendants-appellants' Rule 29 motions (FCA 474-90). The government pushed back on defendants-appellants' claims attacking the sufficiency of the evidence as to the RICO conspiracy charge. (FCA 479-83). Specifically, the government maintained the evidence at trial satisfied the first element of RICO conspiracy because it demonstrated the existence of La Asociación ÑETA as "a group of persons associated together with [the] common goal[] to make money," from murder-for-hire and drug trafficking activities. (FCA 481-82). And their activities affected interstate and foreign commerce because the contraband

they distributed had come from outside Puerto Rico. (FCA 481-82).

The government also contended it met its burden under the second and third elements of RICO conspiracy because the evidence at trial showed defendants-appellants "were all members of [La Asociación ÑETA] and they agreed that they or other members would commit multiple acts of drug trafficking" and murder-for-hire. (FCA 482). Moreover, the evidence also satisfied the final element of RICO conspiracy – that each defendant-appellant agreed that a conspirator would engage in a pattern of racketeering activity – because "every day, members of the organization engaged in the introduction and sale of drugs in the prisons […] in furtherance of the enterprise." (FCA 482). Hence, the government argued that it presented sufficient evidence to uphold the RICO conspiracy convictions against Miranda, Folch, and Andino under Count One. (FCA 483).

As for the fact that Andino had been acquitted of the drug conspiracy charge under Count Two and the Mario Emme VICAR charge under Count Three, the government maintained this did not affect his Count One RICO conspiracy conviction. (FCA 483). The government explained that

inconsistent verdicts such as this only showed "that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." (FCA 483). Furthermore, for the same reasons it had laid out as to the Count One RICO conspiracy charge, the government argued it also presented sufficient evidence to sustain Miranda's and Folch's drug conspiracy convictions under Count Two. (FCA 483-84).

Finally, the government argued the evidence was sufficient to uphold Miranda's and Folch's convictions for the Alexis El Loco VICAR charge under Count Four. (FCA 484-486). Specifically, the evidence showed that, "[b]y paying and convincing [the maximum leadership] to order this murder, Folch-Colon […] helped commit this murder." (FCA 486). And Miranda "aided and abetted this murder by seconding the [kill] order […] and making sure the participating ÑETA members followed through with the order," as was expected and required of him by the enterprise's rules. (FCA 485-86). Indeed, failure to follow through with the order would have resulted in Miranda's fall from grace within the ÑETA ranks, as such disobedience resulted in death. (FCA 485-86).

As for Folch's arguments regarding the government's rebuttal, the government noted the evidence showed Folch "was a Chapter Leader. Specifically, he was part of the chapter leadership at the Monstruo Verde [Green Monster] prison where he advised the main leaders in relation to the finances and the decisions in the chapter. The advisor is part of the leadership." (MMA VI at 489). Thus, the government maintained there was no variance between the evidence and the allegations in the Indictment. (MMA VI at 489). And in any event, the government averred that its rebuttal "merely pointed out to the jury that to find [Folch] guilty they did not have to find that he was a Chapter Leader; they needed to find that the United States proved all the elements of the offense charged beyond a reasonable doubt." (MMA VI at 489). The government further explained that its rebuttal had the purpose of explaining to the jury "that they could make this determination even if they did not agree that [Folch] had a particular role as a Chapter Leader, a clarification that the law supports." (MMA VI at 489).

## XII.   Denial of Rule 29 and 33 Motions and Sentencing Proceedings

Ultimately, the district court denied defendants-appellants' Rule 29 motions and Folch's Rule 33 motion. The proceedings then moved along to

the sentencing phase. In Andino's PSR, the probation officer determined he had a Total Offense Level of 43, based on his participation in the murder of Mario Montañez-Gómez, a/k/a Mario Emme. (DE 3048 at 16). The PSR noted Andino had been acquitted of the murder, but nevertheless, the murder cross-reference applied based on the determination that the evidence presented at trial satisfied the lower preponderance of the evidence standard applicable in sentencing proceedings. (DE 3048 at 15). Combined with a Criminal History Category of V, Andino had a guidelines sentence of life. (DE 3048 at 24). But the PSR pointed out the offense of conviction had a statutory maximum of 20 years. (DE 3048 at 24).

In his sentencing memorandum and again at the sentencing hearing, Andino highlighted he had been acquitted of Counts Two and Three, involving the drug trafficking conspiracy and VICAR counts, respectively, which were "predicate offenses that were required to establish the pattern of racketeering acts of the Count One RICO conspiracy." (AMA 29). Moreover, Andino maintained the evidence against him as to Counts Two and Three also failed to satisfy the preponderance of the evidence standard applicable in sentencing proceedings. (AMA 29-32). Thus, he disagreed with

35

the PSR's application of the murder cross-reference rendering a total offense level of 43 and a guideline sentencing range of life. (AMA 33). Instead, Andino argued his applicable guideline sentencing range should be calculated based on a total offense level of 19 in accordance with U.S.S.G. § 2E1.1. (AMA 33).

For its part, regarding Andino's charged murder, the government maintained the evidence at trial ably satisfied the preponderance of the evidence standard. (AMA 19-20). In support of its position, the government highlighted the testimony of cooperating witness Miguel Alvarez-Medina who placed Andino at the scene of the crime alongside with the other ÑETA members that perpetrated the killing. (AMA 21-22). Furthermore, the government pointed to the testimony from cooperating witness Alex Miguel Cruz-Santos who stated the two top leaders of the organization told him Andino had participated in the murder. (AMA 22). "Andino-Morales was a Missionary for the ÑETA organization – someone who was willing to and participated in an act of violence in furtherance of the enterprise." (AMA 25). The government also noted the evidence showed Andino's participation in

36

the drug trafficking business of the enterprise "by selling drugs belonging to the gang in order to pay for his cellphone." (AMA 25).

In sum, the government agreed with Andino's PSR's sentencing calculations, but noted the applicable guideline sentencing range exceeded the statutory maximum. (AMA 22). Hence, the government recommended a statutory maximum sentence of 20 years' imprisonment. (AMA 26).

At Andino's sentencing hearing, the district court began by noting it had reviewed the PSR and the parties' sentencing memoranda. (DE 3179 at 4-5). It then proceeded to hear the parties' arguments, which rehashed the points they had made in their respective sentencing memorandums. (DE 3179 at 5-10). Regarding the parties' disagreement as to the PSR's guidelines calculation's use of the murder cross-reference, the district court implicitly rejected Andino's position by stating that his "position is so noted." (DE 3179 at 5). The district court also heard Andino's allocution, in which he expressed remorse for his prior "brushes with the law" and highlighted his rehabilitative efforts. (DE 3179 at 9-11). However, he maintained his innocence as to the charges filed against him in this case and claimed he only went to La Asociación ÑETA to avoid being left to fend for himself in prison.

(DE 3179 at 10). He denied selling drugs for the enterprise. (DE 3179 at 10). He also averred he would never kill anybody unless it was to protect his own life or that of his family. (DE 3179 at 10).

Ultimately, although the district court sentenced Andino to 180 months (15 years). (DE 3179 at 11). Andino's counsel objected to the sentence based on the reasons he had previously argued. (DE 3179 at 13). Thereafter, the district court gave Andino words of encouragement, acknowledging that this was a bad day for him, but noting Andino "ha[d] a lot going for [him]" in the form of support from friends and family present in the courtroom and "more importantly" that he had a plan moving forward "and that's good." (DE 3179 at 14).[8] These appeals ensued.

---

8.    Separately, Folch and Miranda were each sentenced to life as to all counts, to be served concurrently with each other, and concurrently with the terms imposed at state level with credit for time served while in federal jurisdiction in connection with the instant case. (FCAdd. 39; MMAdd. 2). Neither challenges their sentence on appeal.

### SUMMARY OF THE ARGUMENT

The government presented sufficient evidence for a jury to convict defendants-appellants of RICO conspiracy under Count One. The evidence, including the testimony of five cooperating witnesses, demonstrated La Asociación ÑETA was a RICO enterprise affecting interstate commerce with its drug trafficking activities and which committed murders. The government's evidence also showed the drugs did not originate in Puerto Rico, therefore they had travelled through foreign and interstate commerce. And case law establishes such an enterprise may have both legitimate and illegitimate purposes and still be considered a RICO criminal organization. The evidence also showed each of the defendants-appellants knowingly and voluntarily joined the ÑETA enterprise and agreed that a pattern of racketeering activity would be committed. For these same reasons, the evidence was sufficient to convict Miranda and Folch[9] of drug trafficking conspiracy under Count Two.

---

9.    On appeal, Folch does not challenge his Count Two conviction for conspiracy to possess controlled substances with intent to distribute.

The evidence was also sufficient to sustain Folch's VICAR murder conviction under Count Four. First, it is undisputed that Folch paid to have ÑETA leadership order its members to murder Alexis El Loco. Second, insofar as Alexis El Loco was Folch's main drug trafficking rival, his death helped Folch maintain his position within the ÑETA enterprise.

Furthermore, although the indictment identified Folch as a chapter leader, the jury did not have to make such a finding to convict. Role in the conspiracy is not an element of the offense. Hence, the government's rebuttal statement to the jury that it need not conclude the Folch was a chapter leader was neither legally incorrect, a surprise, nor prejudicial. Folch had ample notice and opportunity to prepare for the government's evidence at trial that he was a member of La Asociación ÑETA and actively participated in its illegal activities.

Moreover, the district court did not err in instructing the jury as to Puerto Rico first-degree murder. For starters, although it is not specifically mentioned in the Puerto Rico Penal Code, murder-for-hire fits comfortably within the first-degree murder statute. Additionally, a review of the instructions shows the district court explained the elements of murder under

Puerto Rico law with language that, although not specifically mentioned in the statutes, was consistent with the charged offenses. And in any case, the instructions heightened the government's burden. Accordingly, the district court did not abuse its discretion in formulating the jury instructions for Puerto Rico first-degree murder.

Additionally, Andino's downward variant sentence was procedurally and substantively reasonable. First, the district court did not improperly consider acquitted conduct and apply the murder cross-reference of the guidelines. While the jury may have acquitted Andino under Counts Tow and Three under the beyond a reasonable doubt standard, the evidence nevertheless satisfied the lower preponderance of the evidence standard applicable at sentencing proceedings.

The record also provides more than sufficient information from which the district court's sentencing rationale can be inferred. The district court stated it had previously reviewed the PSR and the parties' sentencing memoranda prior to the sentencing hearing, and again heard the parties' arguments at the sentencing hearing. The fact the district court chose not to follow either of the parties' sentence recommendations suggests it

considered and weighed all the information provided by each side and reached its own conclusion as to what constituted a fair and adequate sentence.

Finally, the district court having imposed a sentence that was 60 months below the applicable guideline, Andino's sentence comfortably fell within the wide universe of possible sentence and was, thus, substantively reasonable.

**ARGUMENT**

**I.    The district court properly denied defendants-appellants' Rule 29 motion for a judgment of acquittal because the government presented sufficient evidence.[10]**

**<u>Issue</u>**

Defendant-appellants challenge the district court's denial of their Rule 29 motions. (MMB 37-61; FCB 10-31; AMB 6-19).

**<u>Standard of Review</u>**

This Court reviews the denial of Rule 29 motions for abuse of discretion. *United States v. Valenzuela*, 849 F.3d 477, 483 (1st Cir. 2017).

**<u>Discussion</u>**

Defendants-appellants' different challenges to the district court's denial of their Rule 29 motions are unavailing. "[R]eview of the district court's decision to deny a motion for acquittal is quite limited; [this Court] must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilty beyond a reasonable doubt." *United States v. Hernández*, 218 F.3d 58,

---

10.    In Argument I, the government responds to Miranda's sole? Issue A (MMB 37-61), Folch's Issues I-III (FCB 10-31), and Andino's Issue A (AMB 6-19).

64 (1st Cir. 2000). Importantly, both direct and circumstantial evidence can adequately ground a conviction. *United States v. Bobadilla-Pagán*, 747 F.3d 26, 32 (1st Cir. 2014).

Moreover, this Court does not weigh the evidence or make credibility judgments. *United States v. García-Pastrana*, 584 F.3d 351, 367 (1st Cir. 2009). In other words, the relevant inquiry is not whether the evidence excludes every hypothesis of guilt, but rather whether the jury could reasonably arrive at its verdict provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt. *Hernández*, 218 F.3d at 64. Accordingly, a defendant challenging a conviction for "insufficiency of evidence faces an uphill battle on appeal." *Id.*

The government presented sufficient evidence to convict defendants-appellants of RICO Conspiracy and drug trafficking conspiracy under Counts One and Two of the Indictment. Under RICO, 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Boyle v.*

*United States*, 556 U.S. 938, 943-44 (2009) (quoting 18 U.S.C. § 1962(c)). Moreover, 18 U.S.C. 1962(d) makes it unlawful to conspire in violation of § 1962(c). To convict a defendant of RICO conspiracy, the government must show: (1) the existence of an enterprise affecting interstate or foreign commerce; (2) that the defendant knowingly joined the enterprise; and (3) that the defendant agreed with one or more others that two or more predicate acts would be committed, *i.e.*, a pattern of racketeering activity. *See United States v. Angiulo*, 847 F.2d 956, 964 (1st Cir. 1988).

As to the first element, 18 U.S.C. § 1961(4) defines an "enterprise" to include "any individual, partnership, corporation ... or other legal entity, and any union or group of individuals associated-in-fact although not a legal entity." The Supreme Court has explained an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. *See Boyle*, 556 U.S. at 946. However,

> [s]uch a group need not have a hierarchical structure or a "chain of command;" decisions may be made on an *ad hoc* basis and by any number of methods—by majority vote, consensus, a show of

45

> strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*Id.* at 948; *see also United States v. Nascimento*, 491 F.3d 25, 32 (1st Cir. 2007);

*United States v. Connolly*, 341 F.3d 16, 25 (1st Cir. 2003).

Furthermore, this Court has held a *de minimis* effect on interstate commerce is all that is required to satisfy the jurisdictional component of the first element. *See Nascimento*, 491 F.3d at 37, 45 (considering the fact that the enterprise had an arsenal of at least nine firearms that had been manufactured outside of Massachusetts and had thus moved in interstate commerce in determining the government had established the requisite *de minimis* effect on interstate commerce). Multiple First Circuit cases have noted that "[d]rug dealing typically is an enterprise that affects interstate commerce." *United States v. Guerrier*, 669 F.3d 1, 7 (1st Cir. 2011).

Meanwhile, "[a]ll that is necessary to prove [the second] element of the RICO conspiracy ... is to prove that [the defendant] agreed with one or more

co-conspirators to participate in the conspiracy." *United States v. Shifman*, 124 F.3d 31, 38 (1st Cir. 1997) (quoting *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1562 (1st Cir.1994)). "The requirement of association with the enterprise is not strict." *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002). Thus, "[i]t is not necessary … to find that each defendant knew all the details or the full extent of the conspiracy, including the identity and role of every other conspirator." *Aetna*, 43 F.3d at 1562; *see also United States v. Boylan*, 898 F.2d 230, 243 (1st Cir. 1990). Rather, the "defendant need only be 'aware of at least the general existence of the enterprise named in the indictment,' [], and know about its related activities." *Marino*, 277 F.3d at 33.

Finally, the third element "does not require proof that a defendant 'himself committed or agreed to commit the two predicate acts.'" *United States v. Cianci*, 378 F.3d 71, 90 (1st Cir. 2004) (quoting *Salinas v. United States*, 522 U.S. 52, 61 (1997)). Rather, § 1962(d) only requires that the defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, [*i.e.*] that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65. Furthermore, there must be a nexus between the racketeering acts and the

47

enterprise. *Nascimento*, 491 F.3d at 45. "That nexus exists when a defendant is able to commit the predicate racketeering acts either by means or as a result of his involvement with the enterprise." *Id.*

## A. Defendants-appellants' challenge under the first element of RICO Conspiracy

On appeal, defendants-appellants challenge the sufficiency of the evidence under the first element of RICO conspiracy. (MMB 42). They aver the government failed to prove La Asociación ÑETA acted as an enterprise. (MMB 42; FCB 14; AMB 11). According to Miranda, "[t]he fact that some individuals may engage in a criminal conduct together does not by itself automatically become a RICO enterprise" and the government's evidence did not establish a common purpose (MMB 42-43). For his part, Folch contends "the government could not rely on the existence of La Asociación Ñeta as an inmate group to prove the existence of a RICO enterprise." (FCB 14). Similarly, Andino alleges the government's witness testimony did not prove the existence of an enterprise because they only spoke as to some chapters and members, not all of them. (AMB 11). The record and caselaw does not support their contentions.

48

At trial, the government more than ably demonstrated the existence of La Asociación ÑETA. Notably, cooperating witnesses— former ÑETA members Alex Miguel Cruz-Santos, Jose González-Gerena, Miguel Alvarez-Medina, Orlando Ruiz-Acevedo, and Osvaldo Torres-Santiago— did not limit their testimony to La Asociación ÑETA in its final form. Rather, they gave a full decades-long history of La Asociación ÑETA, its origins, and how its purposes and goals changed in such a way that the organization morphed into a drug trafficking enterprise. Specifically, the cooperating witnesses testified La Asociación ÑETA had its origins in the 1970s as an organization that advocated for prisoner rights and improved living conditions within the Puerto Rico prisons. (MMA II at 98-101; MMA III at 192; MMA IV at 144-45; MMA V at 200)).

However, by the dates relevant to this appeal, from on or about, but no later than 2005 to 2016, the enterprise's purpose changed, or at the very least broadened to include making money for its members by trafficking multi-kilogram quantities of heroin, cocaine, and marihuana, within the Puerto Rico prison system. (MMA II at 98-101; MMA III at 192; MMA IV at 144-45; MMA V at 200)). To accomplish this, the enterprise smuggled, not

49

only the controlled substances themselves, but also cellular phones into the different prisons so they could communicate with one another and with their contacts outside of prison and conduct their drug trafficking scheme. (MMA II at 100-01; MMA IV at 144-45).

Furthermore, although Supreme Court precedent does not require a showing that a given group have a hierarchical structure or a "chain of command" to constitute an enterprise for RICO purposes, *see Boyle*, 556 U.S. at 948, the cooperating witnesses in this case gave a detailed, top-to-bottom account of the structural organization of La Asociación ÑETA. *See supra*, Statement of the Case, Sections I-V. At the top was the maximum leader, who had his own version of a board of directors, known collectively as the maximum leadership, which oversaw the entire operation of La Asociación ÑETA across the Puerto Rico prison system's various correctional institutions. *See supra*, Statement of the Case, Section II. Directly below this maximum leadership were the chapter leaders, ÑETA members who enjoyed the trust of the maximum leadership and were appointed to oversee the enterprise's business within their specific prisons. *Id.* The chapter leaders, in turn, had their own boards of directors that resembled the

50

maximum leadership in composition, but which were dedicated solely to the affairs of their particular prison. *Id.*

Such was the level of organization of La Asociación ÑETA that the cooperating witnesses elaborated on the admissions process, and the basic rules and traditions ÑETA members had to follow and ascribe to once admitted. *See supra*, Statement of the Case, Section IV. The enterprise even had a sort of mentorship program, whereby the enterprise's "elders," *i.e.*, the older, seasoned inmates, taught the younger, newly admitted generation all about the enterprise's origins, traditions, goals, and rules. *See supra*, Statement of the Case, Section V. The rules included (1) no cooperating with law enforcement; (2) no history of lewd activities or domestic abuse, nor abuse of minors or the elderly; (3) no abuse of the weak or drug addicted inmates; (4) "not look[ing] at other inmates as a woman;" and, supposedly, (5) no contract killings. Id. Violation of the rules resulted in punishment deemed proportionate to the severity of the violation. *Id.* For instance, cooperation with law enforcement would result in certain death. *Id.*

The cooperating witnesses further delved into the various traditions of the enterprise, including the organization's color scheme and distinguishing

hand gesture, whereby placing their middle finger on top of their index finger stood for "the strong protects the weak." *Id.* The enterprise also held monthly meetings in commemoration of La Asociación ÑETA's founder where they would raise their fists and chant, "ÑETA, ÑETA, ÑETA." *Id.*

Finally, this Court has already disavowed the argument that La Asociación ÑETA could not be considered a RICO enterprise because some of its endeavors or component parts were lawful. *See United States v. Millán-Machuca*, 991 F.3d 7, 20 (1st Cir. 2021) (explaining that "nothing in the statutory definition of enterprise requires that the enterprise be defined solely by a criminal purpose" and noting "the Supreme Court has recognized that RICO, and, thus, also VICAR, extends to 'both legitimate and illegitimate enterprises'") (quoting *United States v. Turkette*, 452 U.S. 576, 580-581 (1981)). And like in *Millán-Machuca*, "[t]here was more than enough evidence for a reasonable jury to reject the premise that it was a lawful group that happened to include some members who sold drugs." 991 F.3d at 20.

In sum, the evidence presented at trial demonstrated that, from on or about, but no later than 2005 to 2016, La Asociación ÑETA was composed of a group of inmates housed at various correctional facilities throughout the

Puerto Rico prison system that came together with a common goal: to make money for its members by trafficking multi-kilogram quantities of controlled substances within the Puerto Rico prison system. Said goal went beyond any individual act of violence or drug trafficking. Accordingly, as the government ably carried its burden of establishing the first element of RICO conspiracy by proving the existence of La Asociación ÑETA as a RICO enterprise, the district court properly denied defendants-appellants' Rule 29 motions as to Count One of the Indictment.

## B. Defendants-appellants' challenge to the jurisdictional component of the first element of RICO Conspiracy.

Meanwhile, Miranda's, Andino's, and Folch's claim that the government failed to prove the jurisdictional component of the first element, (MMB 52-53; AMB 17; FCB 20-25), also fails to carry the day. The government presented more than enough proof to show a *de minimis* effect on interstate and foreign commerce. *See Nascimento*, 491 F.3d at 37, 45. Specifically, La Asociación ÑETA trafficked in controlled substances, none of which have ever been produced at a mass scale in Puerto Rico. (MMA IV at 291-94). The heroin, cocaine, and marihuana the enterprise distributed and sold

throughout the Puerto Rico prison system necessarily had to have moved in interstate commerce. "The market for illegal drugs constitutes commerce over which the United States had jurisdiction." *United States v. Millán-Machuca*, 991 F.3d 7, 21 (1st Cir. 2021) (citing *Taylor v. United States*, ––– U.S. –––, 136 S. Ct. 2074, 2081 (2016); *see also United States v. Rodríguez-Torres*, 939 F.3d 16 27 (1st Cir. 2019) (stating the required "slight effect" on interstate commerce was established by police officer's testimony that drugs were not produced in Puerto Rico, and hence had to be imported from foreign countries and from the continental United States). Indeed, multiple First Circuit cases have noted "[d]rug dealing typically is an enterprise that affects interstate commerce." *Guerrier*, 669 F.3d at 7.

That the government's expert witness on the matter had not personally examined the contraband seized in this case does not mean his testimony, as Miranda and Folch argue, "was based in general theoretical and speculative concepts" that "cannot be related to the controlled substances seized in this case." (MMB 53); (*see also* FCB 22-23). That the expert witness did not personally inspect the seized contraband or pinpoint its exact origin is of no moment. Whatever the contraband's origin or source may have been, the

expert's testimony made one thing perfectly clear: it did not originate in Puerto Rico because the production and manufacturing of these substances is non-existent on the island. (MMA IV at 291-94). Accordingly, the government's evidence showing La Asociación ÑETA had distributed and sold multi-kilogram quantities of these drugs established the requisite *de minimis* effect on interstate or foreign commerce.

## C. Defendants-appellants' challenge under the second element of RICO Conspiracy

Defendants-appellants' assertion that the evidence failed to prove they knowingly joined and participated in the enterprise is also belied by the record. Indeed, the cooperators made in-court identifications of Miranda, Folch, and Andino, stated they were ÑETA members, and described their roles in the enterprise and the different ways in which they each actively participated in drug trafficking and violent activities in furtherance of La Asociación ÑETA. Defendants-appellants' attempts to dismiss this testimony "gets [them] nowhere." *Millán-Machuca*, 991 F.3d at 20 (citing *United States v. Cortés-Cabán*, 691 F.3d 1, 14 (1st Cir. 2012) (stating testimony

of a cooperating accomplice can be sufficient to sustain a conviction, even if uncorroborated)).

For instance, Miranda was the chapter leader for La Asociación ÑETA at the Ponce main prison, a role the maximum leadership would only give to someone with whom they at some point had a relationship of trust. (MMA II at 137-43, 185-203, 241-51; MMA III at 145-47; MMA IV at 110-11, 155-57, 229-32; MMA V at 129-30, 204-10, 230, 233-35). And as chapter leader at the Ponce Main prison, Miranda distributed heroin, marijuana, and cocaine, as well as engaged in cellphone trafficking for the enterprise. (MMA II at 137-43, 185-03, 241-51; MMA III at 145-47; MMA IV at 110-11, 155-57, 229-32; MMA V at 129-30, 204-10, 230, 233-35). Moreover, when the order to kill Alexis El Loco came down, it was Miranda who seconded the order and ensured it was carried out. (MMA II at 137-43, 185-03, 241-51; MMA III at 145-47; MMA IV at 110-11, 155-57, 229-32; MMA V at 129-30, 204-10, 230, 233-35).

As for Folch, he was an advisor for the chapter leadership at Green Monster. (MMA IV at 219-20). He also bought and distributed heroin for La Asociación ÑETA. (MMA IV at 221-27). And his ÑETA drug trafficking

activities went beyond the walls of the institution where he was being housed at any given time, sending heroin and cocaine to other prisons as well. (MMA IV at 221).

Folch was also not alien to La Asociación ÑETA's murder-for-hire business. (MMA IV at 221-22). Indeed, Folch was the one who paid Rolo, an advisor to the maximum leadership and one of the three heads of the enterprise, and Gerena, the man who would do the deed, to have Alexis El Loco killed. (MMA IV at 221-22). These payments enriched ÑETA members, thereby allowing them to pay the enterprise's drug and cellular phone incentives and continue the business of selling their personal drugs inside the prisons. Payment to Rolo was in clear recognition of the ÑETA enterprise, and that a murder would need to be sanctioned by the enterprise, and that once payment was accepted, the enterprise took on the job and carried it out as part of its activities, irrespective of any initial motivation driving the murder.

And finally, Andino was a ÑETA member who paid the chapter leader at Bayamón 1072 the enterprise's incentive to be able to have his personal marijuana come into the institution for distribution. (MMA III at 205, 213,

311). This was consistent with the enterprise's rules, which allowed for distribution of personal drugs so long as the member paid for the required incentives for the privilege. (MMA II at 114). Meanwhile, he paid for his cell phone privileges in kind, by selling drugs for La Asociación ÑETA. (MMA III at 312). His drug distribution benefited him as a member and the enterprise.

Furthermore, the fact Andino was acquitted of the drug conspiracy charged under Count Two and the VICAR under Count Three gets him nowhere because, to be convicted of RICO conspiracy, all that was necessary was to show he agreed that a co-conspirator would engage in two acts. Indeed, "[a] RICO conspiracy case does not require proof that any racketeering acts were actually carried out." *Id*. Of course, RICO conspiracy may also be proved by evidence that establishes the defendant did, in fact, commit two racketeering acts. *See United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978) ("Where . . . the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable"). But that is not required.

58

In short, defendants-appellants' actions, as described by the witnesses, established their membership and participation in the racketeering acts of the enterprise. *See United States v. Jones*, 455 F.3d 134, 144 (2nd Cir. 2006) (explaining "an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure"). Hence, the record shows the government ably satisfied its burden of proving the second element of RICO conspiracy as to each defendant-appellant beyond a reasonable doubt.

### D. Defendants-appellants' challenge under the third element of RICO Conspiracy.

Miranda's challenge to the sufficiency of the evidence under the third element of RICO conspiracy fares no better. (MMB 42; AMB 9-15). Their contentions that they were "not plainly integral to carrying out the enterprise's activities" and that the evidence failed to show they agreed "with anyone to commit" the predicate offenses establishing a pattern of racketeering activity (MMB 50-51: AMB 12-15) are belied by the record.

As described when addressing Miranda's challenge under the second element, *see supra*, Argument I(C), the evidence showed Miranda was plainly

integral to the enterprise's scheme. Specifically, his role as chapter leader meant he was a person of trust within the maximum leadership, had direct oversight over the enterprise's drug trafficking business at the Ponce main prison, and gave the green light when the maximum leadership's order to kill Alexis El Loco came down.

The fact that at a given moment there were discussions about removing Miranda from his leadership position does not, as Miranda suggests (MMB 50), change this. For one thing, this did not erase all Miranda had already done in furtherance and in the interest of the enterprise and that he was, at one point, considered a valuable and trusted asset by the maximum leadership. Indeed, the fact he was not removed from his post suggests he continued to enjoy the trust of the maximum leadership, despite any possible misgivings by some. Moreover, Miranda's removal from a leadership position would not have been a complete disbarment from the enterprise. Indeed, even if Miranda had been replaced as chapter leader, nothing in the evidence suggests he would not have continued to be a member of La Asociación ÑETA, and as such be subject to the enterprise's rules and directives. Regardless, a conspiracy may still exist even if its

membership changes over time or some defendants cease to participate in it. *See United States v. Garcia*, 785 F.2d 214, 225 (8th Cir. 1986) ("An agreement may include the performance of many transactions, and new parties may join or old parties terminate their relationship with the conspiracy at any time."). And one does not have to hold a leadership position to be considered integral to the enterprise's objectives and activities. RICO conspiracy "is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000).

Meanwhile, Folch's sufficiency claims as to the third element also hold no water. As previously mentioned, *see supra*, Argument I(C), Folch not only distributed controlled substances for the enterprise; he also took advantage of its murder-for-hire services. Folch's assertion he "sent drugs to be sold and tallied for his own profit by those trusted by him, not to profit the enterprise or those trusted by the enterprise" (FCB 19) misses the mark. He overlooks the fact that to move his personal merchandise of controlled substances through ÑETA channels, he had to be a dues/incentive-paying member of the organization.

Furthermore, Folch's, Miranda's, and Andino's contention that the government failed to prove the required predicate acts because it charged first degree murder, but the evidence presented at trial related to a murder-for-hire (which is not specifically criminalized under the Puerto Rico Penal Code) has no force. (FCB 15-16; MMB 52; AMB 16) Indeed, this Court has already addressed this very claim and found it unpersuasive. *See Millán-Machuca*, 991 F.3d at 21 (rejecting defendant's argument "that because murder-for-hire is not an offense specifically criminalized by the Puerto Rico Penal Code, it cannot serve as a predicate offense for a murder in aid of racketeering conviction" because "Puerto Rico has a general murder statute that prohibits the intentional killing of a person […] and that statute plainly applies to the murder alleged here").

In short, defendants-appellants were integral to the enterprise and each "adopt[ed] the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65. Accordingly, their claims under the third element hold no muster. The defendants-appellants having failed to successfully put into question the jury's conclusions as to each element of RICO conspiracy, the

district court properly denied their Rule 29 motions as to Count One of the Indictment.

### E. Miranda's challenges to his drug trafficking conspiracy conviction under Count Two[11]

Miranda's sufficiency claim as to his conviction for drug trafficking conspiracy under Count Two is likewise without merit. To prove a conspiracy existed, the government must prove beyond a reasonable doubt that: (1) an agreement existed to commit the particular crime; (2) the defendant knew of the agreement; and (3) voluntarily participated in it. *See United States v. Gómez*, 255 F.3d 31, 35 (1st Cir. 2001). The conspiratorial agreement may be "express or tacit and may be proved by direct or circumstantial evidence." *Id.* (citing *United States v. Sepúlveda*, 15 F.3d 1161, 1173 (1st Cir. 1993) (internal quotation marks omitted)). For the reasons explained regarding the sufficiency claims as to the RICO conspiracy

---

11.    Folch does not challenge his Count Two conviction on appeal. Thus, he has waived the opportunity to do so. *See United States v. Henry*, 848 F.3d 1, 7 (1st Cir. 2017) (arguments not raised in an opening brief are waived and cannot debut in a reply brief).

conviction, the evidence ably demonstrated Miranda and his co-defendants voluntarily and knowingly joined and participated in a drug conspiracy.[12]

Moreover, although the government did not have to prove the commission of an overt act in furtherance of the Count Two conspiracy, it did just that by establishing the drug quantities sold by the enterprise and the murders carried out in furtherance of that conspiracy. *United States v. Rosario-Pérez,* 957 F.3d 277, 289 (1st Cir. 2020) (citing *United States v. Vega-Figueroa*, 234 F.3d 744, 754 (1st Cir. 2000) (noting "[t]he government is not required to allege or prove any overt act as an element of a § 846 conspiracy" and explaining introduction of evidence of a murder does not turn a drug trafficking conspiracy case into a murder case).

### F. Folch's and Miranda's claim that the evidence was insufficient to sustain his VICAR conviction under Count Four.

---

12. The record also contradicts Miranda's assertion (MMB 45) that inmates had no other choice but to join an organization. Specifically, as one of the cooperating witnesses testified, they all had "the option to choose." (MMA II at 102). "If you want to join a group, then you choose" which group you wanted to join. (MMA II at 102). In other words, inmates had the option of either joining other organizations or remaining neutral.

Folch's contention that the government failed to prove the murder of Alexis El Loco was committed in furtherance of the enterprise or to otherwise maintain or increase the position of the ÑETA members who did the killing has no factual or legal footing. A VICAR violation requires a showing of five elements: "(1) there was an 'enterprise,' (2) that engaged in 'racketeering activity,' (3) affecting interstate or foreign commerce (jurisdictional element), (4) and the defendant committed a crime of violence, (5) 'for the purpose of gaining entrance to or increasing or maintaining his position in the enterprise." *United States v. Jones*, 566 F.3d 353, 363 (3d Cir. 2009) (citing 18 U.S.C. § 1959(a)).

As explained previously, *see supra*, Argument Sections A-D, the government's evidence ably demonstrated the first three elements that La Asociación ÑETA was an 'enterprise,' that engaged in 'racketeering activity and affected interstate or foreign commerce. Moreover, the evidence also established Folch aided and abetted in the commission of the murder by paying to have ÑETA members kill Alexis El Loco and for the maximum leadership's order to do so. (MMA II at 230; MMA IV at 221-22). And in so doing, Folch made sure ÑETA members murdered Alexis El Loco because it

65

was expected of their membership in the enterprise. (MMA II at 105, 137-43, 185-03, 241-51; MMA III at 145-47; MMA IV at 110-11, 155-57, 229-32; MMA V at 129-30, 201, 204-10, 230, 233-35). *See Millan-Machuca*, 991 F.3d at 21-22 (finding the testimony from the cooperating witnesses – the same witnesses that testified in this case as to the same matters – demonstrated the killing of Alexis El Loco was "a murder-for-hire ordered by Millán-Machuca in his capacity as a leader of ÑETA, not a crime planned solely by Folch-Colon and González-Gerena").

The fact there may have also been additional personal motivations behind Folch's decision to pay to have Alexis El Loco killed does not make the ample evidence tying the murder of Alexis El Loco to La Asociación ÑETA, whose maximum leadership authorized the killing, go away nor does it erase the benefit of gains to its members and its role in furthering the enterprise's reputation for violence. *See United States v. Brandao*, 539 F.3d 44, 56 (1st Cir. 2008) (noting the VICAR statute "does not require that the government prove that maintaining or increasing one's position in an enterprise was "the sole purpose" and stating the "question of motive under

VICAR was for the jury to resolve" where there was evidence of both personal and gang-related motivations).

Indeed, this Court has stated a VICAR conviction can stand if the crime of violence was committed to retaliate against rivals, eliminate competition, or because the defendant knew it was expected of him by reason of his membership in the enterprise. *See United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998) (internal citations omitted). And here, as noted by Folch in his opening brief, the cooperating witnesses stated Folch "had a private drug business outside the prison" and Alexis EL Loco was "a sworn enemy connected to those dealings." (FCB 4). Thus, by having one of his main rivals in the drug business killed, Folch ensured he was able to maintain his position within La Asociación ÑETA. *See Millan-Machuca*, 991 F.3d at 21-22 (explaining VICAR does not require the government prove that gaining entrance or maintaining or increasing ones position in an enterprise is "the sole purpose" of a murder in aid of racketeering).[13]

---

13.  In his brief, Folch contends Gerena "admitted" the murder of Alexis El Loco "had nothing to do" with the enterprise (FCB 27). A review of the transcript, however, shows that at the time Gerena was referring to the fact that Alexis El Loco's threats to Folch's family. (MMA V at 127).

Meanwhile, Miranda's claim that he had nothing to do with the murder of Alexis El Loco because such orders from the maximum leadership could not be overturned and he had no choice but to second it (MMB 45-47) has no force. For one thing, Miranda was well aware of the rules and agreed to abide by them upon joining the enterprise. Moreover, rather than showing he had his hands unwillingly tied, what the evidence shows is that it was up to Miranda, as chapter leader, to decide when the opportune moment was to carry out the maximum leadership's order to kill Alexis El Loco.

Accordingly, this Court should pay no mind to Folch's and Miranda's attacks on their VICAR convictions under Count Four.

---

This is a far cry from saying that the murder itself had nothing to do with La Asociación ÑETA.

**II.** **The government's rebuttal argument that the jury need not find that Folch was a chapter leader in order to convict was neither legally incorrect nor prejudicial, much less unfairly so.[14]**

**Issue**

Folch asserts the government's closing rebuttal statement that it did not have to prove the Folch was a chapter leader, as alleged in the indictment, in order to convict was unfairly prejudicial to him and warranted a mistrial. (FCB 46-49).

**Standard of Review**

When a defendant timely objects to a prosecutor's comment during closing argument, this Court reviews the claim *de novo* "to see whether the contested comment was improper." *United States v. Freitas*, 904 F.3d 11, 24 (1st Cir. 2018) (citing *United States v. Rodríguez*, 675 F.3d 48, 62 (1st Cir. 2012)). If the comment was improper, this Court moves on to consider "whether it was harmful, knowing that the harmfulness question turns on whether the comment 'so poisoned the well that the trial's outcome was likely affected,

---

14. In Argument II, the government responds to Folch's Issue V. (FCB 46-49).

thus warranting a new trial.'" *Id.* (quoting *Rodríguez*, 675 F.3d at 62); *see also United States v. González-Pérez*, 778 F.3d 3, 19 (1st Cir. 2015). In making this harmfulness determination, this Court looks to "(1) the severity of the misconduct, including whether it was isolated and/or deliberate; (2) whether curative instructions were given; and (3) the strength of the evidence against the defendant." *González-Pérez*, 778 F.3d at 19 (citing *Rodríguez*, 675 F.3d at 62).

However, "when a party forfeits an error by failing to make a contemporaneous objection" after the offending comment is made during closing arguments or immediately after closing arguments, this Court has "the discretion to reverse only for 'plain error,' *i.e.*, error that is 'clear' and 'obvious' and that was 'prejudicial' to the defendant in that it 'affected the outcome of the District Court proceedings.'" *United States v. Wihbey*, 75 F.3d 761, 769-70 (1st Cir. 1996) (quoting *United States v. Olano*, 507 U.S. 725, 732–36 (1993)); *see also United States v. Carpenter*, 736 F.3d 619, 630 (1st Cir. 2013) (reviewing challenge to government's personal-opinion argument during its closing argument for plain error where defendant "failed to object contemporaneously or to include it in his objections immediately after the

closing argument"). This Court only exercises that discretion "if the plain forfeited error seriously affects the fairness, integrity, or public reputation of judicial proceedings; an example of such an error is one that causes the conviction of an actually innocent defendant." *Id.* at 769-70.

**Discussion**

Folch's challenge to the government's rebuttal statement is unavailing. Boiled down to its essence, Folch's claim is that by arguing the government did not need to prove he was a chapter leader as alleged in the indictment, the government either constructively amended or prejudicially varied from the indictment. The Presentment Clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury" (with exceptions not relevant to this case). U.S. Const. Amend V. Accordingly, "after an indictment has been returned[,] its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960) (citing *Ex Parte Bain*, 121 U.S. 1 (1887)). A constructive amendment occurs "'when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court

after the grand jury has last passed upon them.'" *United States v. Fornia-Castillo*, 408 F.3d 52, 66 (1st Cir. 2005) (quoting *United States v. Fisher*, 3 F.3d 456, 462 (1st Cir. 1993). In contrast, a variance from the indictment "occurs when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment." *Id.* (quoting *Fisher*, 3 F.3d at 463). While the former is considered *per se* prejudicial and grounds for reversal, the latter will only lead to reversal "if it affected the defendant's substantial rights." *Id.* In other words, a variance will not warrant reversal "[s]o long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged—so long as the difference does not cause unfair prejudice." *Id.* (quoting *United States v. Twitt*y, 72 F.3d 228, 231 (1st Cir. 1995).

Here, because role in the conspiracy is not an element of the offense, *id.*, Folch's claim is that there was an unfair variance between the facts proven at trial and the allegations in the Indictment. The evidence presented at trial and the law do not support this assertion. For starters, as the government explained in the district court, there was no variance because the evidence showed Folch was an advisor to the chapter leaders at one of

72

the prisons and, as such, was part of the chapter leadership. *See United States v. Rodríguez*, 525 F.3d 85, 103 (1st Cir. 2008) (finding a jury can convict even in cases where the facts found are somewhat different from those charged as long as the statutory violation remains the same and the difference does not cause unfair prejudice) (internal citation omitted).

Moreover, even if there was a variance, Folch cannot show it affected his substantial rights. His argument that the jury never heard any evidence that he was a chapter leader "misapprehends the nature of the substantial rights protected by the prohibition on prejudicial variance from an indictment, namely, the rights to 'have sufficient knowledge of the charge against [one] in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense.'" *Id.* (quoting *United States v. Tormos-Vega*, 959 F.2d 1103, 1115 (1st Cir.1992)).

Here, the record shows Folch had ample notice of and ample opportunity to prepare to meet the government's evidence at trial that he was a member of La Asociación ÑETA and an active participant in its illegal endeavors. *See Boyle v. United States*, 556 U.S. 938, 948 (2009) (clarifying that under RICO, members of an association-in-fact enterprise need not have

73

fixed roles). Folch's particular role in the conspiracy as alleged in the Indictment "was unrelated to his defense theory; rather, [he] was well aware that his 'central defense . . . needed to be that he was not part of [the] organization—as a [chapter leader], or in any other capacity." *Id.* (quoting *United States v. Alicea–Cardoza*, 132 F.3d 1, 6 (1st Cir. 1997) (no impermissible variance where defendant was indicted "for being a conspirator/triggerman but the evidence proved him a conspirator/runner"). Accordingly, Folch was not misled by the government's evidence at trial to "defend himself on the wrong grounds" and was able to "prepare an effective defense and avoid surprise at trial." *Id.* (quoting *Tormos-Vega*, 959 F.2d at 1115).

Moreover, Folch's assertion that the jury instructions were faulty because they identified him as a chapter leader has no force. It is true the district court told the jury that the Indictment alleged Folch was a chapter leader. But when explaining to the jury what they needed to find to convict Folch and his co-defendants of RICO conspiracy under Count One, the district court instructed them that "[t]he membership of the enterprise may change over time by adding or losing individuals during the course of its existence" and "[m]embers of the group need not have fixed roles, and

74

different members may perform different roles at different times." (MMA VI at 162). For that reason, there was nothing for the government to object to preserve the argument that the law provides, that it was only required to prove the elements of the offense. Likewise, because role is not an element of the offense, Folch's claim that the verdict form was faulty because it did not identify roles in the enterprise (FCB 44-46) is equally unpersuasive.

The above also demonstrates Folch cannot claim surprise or prejudice with regard to his closing argument. While he avers he was misled into believing that the government had to prove he was a chapter leader, role is not an element of the offense and the jury instructions made clear that it was not necessary to find defendants had a fixed role within the enterprise.

In short, there was no variance nor surprise. And even if there had been, it did not affect Folch's substantial rights, and thus, the district court did not err in denying his motion for mistrial. Accordingly, this Court should reject Folch's contention that the government's rebuttal argument, coupled with the fact that it did not object to the jury instructions, misled him or otherwise left him unprepared to defend himself at trial.

### III.    The district court did not err in instructing the jury.[15]

**Issue**

Folch and Miranda claim the district court committed instructional error when explaining Puerto Rico first degree murder to the jury in its jury instructions and thereby constructively amended the indictment. (MMB 53-54; FCB 31-45).

**Standard of Review**

This Court reviews decisions not to impart a requested jury instruction for abuse of discretion. *United States v. Belanger*, 890 F.3d 13, 32 (1st Cir. 2018).

**Discussion**

The district court properly denied Miranda's and Folch's apparent request to stick to a verbatim recitation of the Puerto Rico statute. If a district court refuses to give a proposed jury instruction, this Court only reverses if

---

15.    In Argument III, the government responds to Folch's Issue IV (FCB 31-45). Furthermore, in the "Summary of the Argument" section, Miranda mentions arguments averring that the evidence showed existence of multiple conspiracies and that the district court erred in not providing a multiple conspiracies instruction. This claim was not mentioned or further developed in the "Argument" section of his brief. Thus, it has been waived. *United States v. Zannino*, 895 F.2d 1, 7-10 (1st Cir. 1990).

the proposed instruction is "(1) substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concern[ed] an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." *United States v. González–Pérez*, 778 F.3d 3, 15 (1st Cir. 2015) (quoting *United States v. González–Soberal*, 109 F.3d 64, 70 (1st Cir. 1997)).

Although the government does not claim Folch's and Miranda's proposition that the district court stick to the language specifically in the Puerto Rico statute is incorrect or that it did not concern an important point in the trial, the district court's chosen jury instruction substantially covered and was wholly consistent with the essence of the statutory language. Indeed, Folch concedes the differences were "subtle." (FCB 34).

For instance, although they complain the Puerto Rico Penal Code does not use the term "malice," it nevertheless defines intent as "[w]hen the corresponding act has been performed with a conduct voluntarily geared toward accomplishing it; the corresponding act is a natural consequence of the voluntary conduct of the author, or (c) when the subject has wanted his/her conduct conscious of the fact that it implied a considerable and

illegal risk of producing the criminal act produced." P.R. Laws tit. 33, § 4651.
This is substantially similar to the district court's instruction that a person
acts with malice "if he (1) intended to kill the victim, (2) intended to cause
grievous bodily harm to the victim, or (3) intended to do an act which, in the
circumstances known to the person, a reasonable person would have known
created a plain and strong likelihood that death would result." (MMA VI at
170). And in any event, to the extent the district court included a malice
definition when Puerto Rico law only requires intent, as Folch admits, this
only "expanded" the instructions by adding malice (FCB 37). This would
only serve to heighten the government's burden.

The same holds true regarding the contention that the district court
should not have instructed the jury as to the terms "willful" and
"deliberate." (FCB 39). For starters, the district court instructed the jury that
"as used in this instruction" the term "willful" "means intentional," thereby
relating back to its earlier instructions relating to the definition of intent.
(MMA VI at 173). And in definition "deliberate" as "formed or arrived at or
determined upon as a result of careful thought and weighing of
considerations for and against the proposed course of action," the district

court harkened back to the third modality of intent under the Puerto Rico Penal Code, *i.e.*, "when the subject has wanted his/her conduct conscious of the fact that it implied a considerable and illegal risk of producing the criminal act produced." P.R. Laws tit. 33, § 4651(c).

Finally, Folch's claim that the district court's instruction regarding "knowing participation" in murder "deviated" from the Puerto Rico Penal Code's definition of conspiracy (FCB 40) misses the mark. That is because neither of the VICAR counts was charged as a conspiracy. (MMA VI at 342-47). Rather, the VICAR counts were charged in the modality of aiding and abetting. (MMA VI at 342-47). Thus, they did not call for a conspiracy instruction.

In short, a review of the instructions shows the district court explained the elements of murder under the Puerto Rico Penal Code to the jury in much the same way it explained the elements of the other charged offenses charged. Namely, by using language that, although not specifically mentioned in the statutes, were nevertheless consistent with the charged statutes. Because the instructions did not modify in anyway the offenses charged, there was no constructive amendment to the indictment, the jury's

finding of guilt is valid, and Miranda's and Folch's claim should be disregarded.[16]

Furthermore, the case law Folch cites in his opening brief does not support his contention that Count Four required a special verdict form for the jury to make a specific finding as to the motive element. In *United States v. Ferguson*, 246 F.3d 129, 137 (2d Cir. 2001), the district court stated that lack of a special verdict form identifying the motive found by the jury was but one of many secondary considerations it considered when granting a motion

---

16. As for Folch's claim that the district court erred by referring to La Asociación ÑETA and "enterprise" interchangeably throughout the jury instructions (FCB 42), a review of the instructions as a whole shows that this did not take away this finding from the jury. Indeed, at the very beginning of the instructions, the district court made clear that the Indictment alleged that La Asociacion ÑETA "evolved over time from a group of inmates striving to better their conditions to a criminal organization and that the Indictment in this case alleges that the enterprise was an organization known as Ñeta." (MMA VI at 159-160, 162). And it instructed the jury that, to find the defendants guilty of RICO conspiracy they had to find beyond a reasonable doubt that "there was a conspiracy to commit the crime of racketeering." (MMA VI at 158). Moreover, it defined to the jury what an "enterprise" was for RICO purposes and reminded them that the Indictment alleged that La Asociación ÑETA was a criminal enterprise. (MMA VI at 161-62). Hence, it was up to the jury to make the ultimate finding regarding the existence of an enterprise.

for new trial. *Id.* On appeal, the Second Circuit stated that "[b]ecause the district court did not abuse its discretion in granting a new trial based on incompetent motive evidence, we need not discuss these additional issues." *Id.* But, rather than require a specific special finding, the Court clarified this was "a matter for the trial court's discretion in managing a new trial." *Id.* As long as the district court properly instructs the jury as to the two motive requirement, there is no requirement the jury make a specific finding in the verdict form as to which of the motive requirements they are finding the defendant guilty on the VICAR count. And it did so here. (MMA VI at 172) (instructing the jury that to convict on the VICAR count it had to find that "such underlying crime of violence was committed either [1] as consideration for the receipt of or as consideration for a promise or agreement to pay anything of pecuniary value from the charged enterprise, or [2] for the purpose of gaining entrance to or maintaining or increasing the position of the enterprise").

For these reasons, the district court did not abuse its discretion in deciding to instruct the jury as it did.

**IV.    The district court did not procedurally or substantively err in imposing Andino's sentences.[17]**

<u>Issue</u>

Andino contends the district court erred in considering acquitted conduct for sentencing purposes, failed to state the reasons for the chosen sentence in open court, and imposed a substantively unreasonable sentence. (AMB 19-28).

<u>**Standard of Review**</u>

This Court reviews preserved procedural challenges and the substantive reasonableness of a sentence for abuse of discretion. *United States v. Rivera-Berrios*, 968 F.3d 130, 133-134 (1st Cir. 2020). Unpreserved procedural challenges, however, are reviewed for plain error only, under which "the defendant must show '(1) that an error occurred (2) which was

---

17.    In Argument IV, the government responds to Andino's Issues B and C. (AMB 19-28). Miranda and Folch do not challenge the procedural and substantive reasonableness of their sentences. *United States v. Henry*, 848 F.3d 1, 7 (1st Cir. 2017) (arguments not raised in an opening brief are waived and cannot debut in a reply brief). Folch does make a one-line claim that "if the verdict in count four is reversed, the case must be returned for resentencing on all other counts." (FCB 49). However, with no accompanying factual or legal support, Folch has waived this claim for lack of development. *Zannino*, 895 F.2d at 7-10.

clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Romero*, 896 F.3d 90, 92 (1st Cir. 2018) (quoting *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001).

## Discussion

Andino's sentencing claims fail to carry the day. Appellate review of a sentence is a bifurcated process. *United States v. Politano*, 522 F.3d 69, 72 (1st Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). First, the Court evaluates whether the district court committed any procedural errors. *Id.* at 38, 45-46. Such errors include "failing to calculate (or improperly calculating) the Guideline range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence — including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51. If the district court committed no procedural error, or any error was otherwise harmless or non-prejudicial, this Court then considers the substantive reasonableness of the sentence. *Id.*

Andino's procedural claims fail on appeal. For starters, the district court did not erroneously consider acquitted conduct in its sentencing calculus. Not only does this argument misrepresent the district court's use of the information at the sentencing hearing, but it overlooks that the 18 U.S.C. § 3553(a) sentencing factors "invite the district court to consider, broadly, the nature and circumstances of the offense and the history and characteristics of the defendant and the need for the sentence imposed to protect the public from further crimes of the defendant." *United States v. Marsh*, 561 F.3d 81, 87 (1st Cir. 2009) (quoting *Politano*, 522 F.3d at 74).

In conducting this analysis, the district court is tasked with "sift[ing] the available information and balanc[ing] the pertinent factors (both mitigating and aggravating)." *United States v. Madera-Ortiz*, 637 F.3d 26 (1st Cir. 2011). Indeed, "courts have long been permitted to consider more than charged conduct in fashioning sentences." *United States v. Anonymous Defendant*, 629 F.3d 68, 76 (1st Cir. 2010) (citing *United States v. Lombard*, 102 F.3d 1, 4 (1st Cir. 1996)). That is because "[t]he intent of Congress and the Sentencing Commission was clearly to leave wide open the information-gathering process at sentencing" and the "only qualifier imposed is that the

information must be reliable." *United States v. Rodríguez-Cardona*, 924 F.2d 1148, 1155 (1st Cir. 1991). Hence, the district court's inquiry is "broad in scope" and "largely unlimited" either as to the kind of information it may consider or the source from which it came from. *Dawson v. Delaware*, 503 U.S. 159, 164 (1992) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"); U.S.S.G. § 1B1.4.

In fact, sentencing courts may "even consider acquitted conduct, if proved by a preponderance of the evidence." *Anonymous Defendant*, 629 F.3d at 76 (citing *United States v. Watts*, 519 U.S. 148, 157 (1997) (*per curiam*)). "While the jury must, of course, find facts beyond a reasonable doubt, a preponderance-of-the-evidence standard applies to the sentencing court's factual findings." *United States v. Fermin*, 771 F.3d 71, 82 (1st Cir. 2014). The preponderance of the evidence standard likewise applies when imposing an offense-level enhancement based on acquitted conduct. *Watts*, 519 U.S. at

157. The preponderance of the evidence standard is a "more likely true than not" rule. *United States v. Marino*, 833 F.3d 1, 8 (1st Cir. 2016).

The district court's conclusion that the murder cross-reference applied deserves this Court's deference. *Buford v. United States*, 532 U.S. 59, 63 (2001) (noting "the relevant federal sentencing statute requires a reviewing court not only to 'accept' a district court's 'findings of fact' (unless 'clearly erroneous'), but also to 'give due deference to the district court's application of the guidelines to the facts.'") (citing 18 U.S.C. § 3742(e)). Moreover, "the argument for deference peaks when," as here, "the sentencing judge has presided over a lengthy trial and is steeped in the facts of the case." *United States v. Sepúlveda*, 15 F.3d 1161, 1200 (1st Cir. 1993).

Furthermore, Andino's contention that the preponderance of the evidence could not be met because evidence suggested there was another ÑETA member with his same nickname also fails to carry the day. While the cooperating witnesses acknowledged that there were two individuals with the same nickname, they always asserted they were referring to Andino when testifying as to the evidence in this case. (MMA III at 213). Moreover, although true that if evidence viewed in the light most favorable to the

verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, "a reasonable jury must necessarily entertain a reasonable doubt," *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995), the same does not occur under the preponderance of the evidence standard. Under the latter, it is not required to eliminate all reasonable doubt. Rather, all that is necessary is a showing that it is "more likely true than not." *Marino*, 833 F.3d at 8.

Having presided over the trial, heard the evidence presented, and observed witnesses as they gave their testimony, the sentencing judge had a superior vantage point to determine whether, although the jury acquitted Andino of the drug conspiracy and VICAR counts under the beyond a reasonable doubt standard, the evidence nevertheless satisfied the less stringent preponderance of the evidence standard.

Meanwhile, contrary to what Andino asserts for the first time on appeal, the record illustrates the district court's reasons for its chosen imprisonment term at the sentencing hearing. For starters he does not mention, let alone attempt to satisfy the plain error standard. Thus, he has

waived the claim. *United States v. Zannino*, 895 F.2d 1, 7-10 (1st Cir. 1990). In any case, the claim fails under plain error.

The district court need not mention every single factor and argument raised by the parties. Even though a district court is obliged to "consider all relevant section 3553(a) factors," this Court has explained "it need not do so mechanically." *Id.* at 226 (affirming sentence where the court did not assign the weight to certain factors defendant thought appropriate); *see United States v. Clogston*, 662 F.3d 588, 592 (1st Cir. 2011) (internal quotation marks omitted). A district court "is not required to address those factors, one by one, in some sort of rote incantation when explicating its sentencing decision." *United States v. Dixon*, 449 F.3d 194, 205 (1st Cir. 2006). Rather, "the [district] court's explication of its sentencing calculus need only 'identify the main factors driving its determination.'" *United States v. Daoust*, 888 F.3d 571, 576 (1st Cir. 2018) (quoting *United States v. Sepúlveda-Hernández*, 817 F.3d 30, 33 (1st Cir. 2016)). A district court's reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did. *See United States v. Jiménez-Beltré*, 440 F.3d

514, 519 (1st Cir. 2006), abrogated on other grounds *Rita v. United States*, 551 U.S. 338 (2007).

Although the district court did not explicitly lay out its reasoning for its chosen sentence, it did craft the sentence after reviewing the PSR, the parties' sentencing memoranda, and listening to arguments from the government, defense counsel, as well as Andino's allocution at the sentencing hearing. (DE 3179 at 1-10). The district court did not follow either of the parties' sentencing recommendations. (DE 3179 at 11). While the government argued for a guideline 20-year sentence and Andino asked for a sentence based on the applicable guideline sentencing range for a Total Offense Level of 19, the district court instead imposed a downward variant sentence of 15 years. (DE 3179 at 11). This suggests that, while the district court concluded the murder cross-reference applied, it nevertheless agreed Andino's acquittal on the drug conspiracy and VICAR charges, as well as his demonstrated rehabilitative efforts, deserved some weight (although not as much as Andino would have hoped). (DE 3179 at 14). *See United States v. Jiménez-Beltre*, 440 F.3d 514, 519 (1st Cir. 2006) (noting "a court's reasoning can often be inferred by comparing what was argued by the parties or

contained in the pre-sentence report with what the judge did"). *See also United States v. Ruperto-Rivera*, 16 F.4th 1, 7 (1st Cir. 2021) (holding the sentencing rationale was plausible because "[t]he sentence imposed was a logical culmination of the sentencing court's juxtaposition and evaluation of the relevant sentencing factors").

In short, based on the facts of this case, as well as Andino's history and characteristics, the district court did not plainly err in the manner in which it considered the guidelines and in deciding on the chosen downward variant imprisonment term. Accordingly, the district court imposed a procedurally sound sentence.

Andino's sentence is also substantively reasonable. With a guideline sentence of 20 years (because the applicable guideline range of life exceeded the statutory maximum), the district court's 15-year sentence constitutes a significant downward variance. As this Court has explained, challenging the substantive reasonableness of a sentence is an uphill battle, and reversal is "particularly unlikely when . . . the sentence imposed fits within the compass of a properly calculated [guideline sentencing range]." *United States v. Vegas-Salgado*, 769 F.3d 100, 105 (1st Cir. 2014). "A sentence is substantively

90

reasonable so long as it rests on a 'plausible sentencing rationale' and embodies a 'defensible result.'" *United States v. Ruiz-Huertas*, 792 F.3d 223, 228 (1st Cir. 2015). Moreover, this Court has stated sentences falling within or below a properly calculated guideline range deserve a presumption of reasonableness. *United States v. Ortiz-Mercado*, 919 F.3d 686, 690-91 (1st Cir. 2019) (citing *United States v. Llanos-Falero*, 847 F.3d 29, 36 (1st Cir. 2017)).

Under these circumstances, to prevail Andino must point to "fairly powerful mitigating reasons" and persuade this Court that the district court unreasonably weighed the aggravating and mitigating factors under 18 U.S.C. § 3553(a) factors. *Id.* But Andino has not even attempted to "accomplish th[e] heavy lift," *Ruperto-Rivera*, 16 F.4th at 7, of overcoming that presumption. *United States v. Cortés-Medina*, 819 F.3d 566, 572 (1st Cir. 2016) ("At a bare minimum, a defendant must adduce fairly powerful mitigating reasons and persuade us that the district court was unreasonable in balancing pros and cons"). Presenting mitigating reasons on appeal already advanced in the district court does not satisfy this burden when the record does not indicate the district court overlooked them in fashioning the sentence imposed. *Id.* Thus, given his downward variant imprisonment term

is within the wide universe of possible sentences the district court could have

imposed, Andino's reasonableness claim fails to carry the day.

CONCLUSION

For the foregoing reasons, this Court should affirm defendants-appellants' convictions and sentences.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 22nd day of March 2022.

> W. STEPHEN MULDROW
> United States Attorney
>
> /s/ Mariana E. Bauzá-Almonte
> Assistant United States Attorney
> Chief, Appellate Division
>
> /s/ Francisco A. Besosa-Martínez
> Assistant United States Attorney
> U.S. Attorney's Office
> Torre Chardón, Suite 1201
> 350 Carlos Chardón Avenue
> San Juan, Puerto Rico 00918
> Tel. (787) 766-5656
> Fax (787) 771-4050

93

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

**Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☑ this brief contains **18,124** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    ☐

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☑ this brief has been prepared in a proportionally spaced typeface using <u>Book Antiqua</u> in <u>14 point</u>, *or*

    ☐ this brief has been prepared in a monospaced typeface using _____ with _____.

Dated: 3/22/2022          /s/ Francisco A. Besosa-Martínez
                                    Signature of Filing Party

CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 22, 2022, I electronically filed the

brief with the Clerk of the Court using the CM/ECF system, which will send

notification to all attorneys of record.

/s/ Francisco A. Besosa-Martínez
Assistant United States Attorney

95